Indictment for murder. The defendant was convicted of murder in the second degree.
The defendant shot and killed the deceased in Bergerberg, a suburb of Kannapolis, between 8 and 9 o'clock on the night of 25 October, 1921. About 8 o'clock the defendant, according to his statement, accompanied by Mrs. Robert Lowe, left the Cline boarding-house at Kannapolis in a Buick car, intending to go to the home of Oscar Overcash, who lived near the scene of the homicide. After getting into the car he laid his pistol in Mrs. Lowe's lap. About the same time the deceased, traveling in a Ford sedan, carried a woman named Carrie Kimball through a part of the town not far from Overcash's residence, and, leaving her for a few minutes near Lawing's store, went to the Cabarrus Cotton Mill and told P. M. Mangum, a mechanic, that Mrs. Kimball wanted to see him. The deceased, with Mangum, then went back to Mrs. Kimball, and again she got in the car. The sedan was next driven down Leonard Street, thence up the Bethpage road to the mail boxes where the woman and Mangum alighted. The deceased left them there. Mangum said, "He (the deceased) went up the road; he turned around and came back in about five minutes or ten, I don't know exactly, and came back by us about 30 miles an hour, I imagine, and didn't stop, and turned back into this street where they said the shooting was done." A witness for the State testified that when the sedan stopped the first time near Lawing's store he walked up to it and found a man and a woman there, the woman standing on the running board; that the man went on in the car, the woman saying she would remain; that this woman was Mrs. Lowe, not Mrs. Kimball; and that the Buick passed her six or eight minutes before the sedan came back from the Cabarrus Mill.
After leaving his boarding-house, the defendant drove down the National highway to Overcash's garage, found it closed, and turned the car around and started up the Bethpage road towards the residence of Overcash. Just before getting to this road he saw the sedan drive into the highway, turn around, and go up the Bethpage road ahead of him. The cars were going in the same direction, and several turns were made by each. When the defendant got in front of Overcash's house he stopped his car; whether he stopped the engine was disputed. The sedan was standing fifty or sixty yards ahead. As to what next took place the evidence was conflicting. There was evidence for the State tending to show these circumstances: Just before the sedan stopped some one in the Buick "hollered"; then two people got out of the sedan, went back to the other car, and talked with some one there about five minutes; the door of the car was heard to shut; the man who had come from the sedan started back, and when he had gone two steps from the Buick three shots were fired. The deceased went about five steps and fell. One wound was found in the left upper chest and another in the *Page 759 
region of the left kidney. It was not certain whether the one who came with the deceased was a man or a woman.
The theory of the State was that the account of the transaction given by the defendant Thomas and Mrs. Lowe was not true; that before arriving on the scene of the tragedy, Mrs. Lowe had left Thomas's car and had been taken up by Allen; that for this reason Thomas was following Allen's sedan, and when the cars stopped Allen and Mrs. Lowe left the Ford and advanced towards Thomas, who was in the other car; that some words occurred between them, and thereupon Thomas intentionally shot the deceased in a spirit of revenge caused by his association with Mrs. Lowe. To contradict this theory of the State, the defendant introduced as witnesses P. M. Mangum and Mrs. Kimball. Mangum testified that it was Mrs. Kimball who was standing on the side of the road near Lawing's store, and who got in the car with Allen, and not Mrs. Lowe. Mrs. Kimball testified to the same effect.
The defendant admitted that he shot and killed the deceased with a pistol, but contended that he shot in self-defense. The State contended that he was guilty of murder in the first degree, or murder in the second degree, or manslaughter.
When a person charged with homicide is on trial for the capital felony, and there is evidence tending to show murder in the first degree, murder in the second degree, manslaughter, and self-defense, it is the duty of the presiding judge, in his instructions to the jury, to declare and explain the law applicable to the various phases of the evidence relating to self-defense, and to the several degrees of felonious homicide. And such instructions should be given upon all the essential questions of law properly raised by the evidence. In S. v. Merrick, 171 N.C. 795, it is said: "The authorities are at one in holding that both in criminal and civil causes a judge, in his charge to the jury, should present every substantial and essential feature of the case embraced within the issue and arising on the evidence, and this without any special prayer for instructions to that effect. Charged with the duty of seeing that impartial right is administered, it is a requirement naturally incident to the great office he holds, and made imperative with us by statute law. Revisal, sec. 535: `He shall state in a plain and correct manner the evidence in the case, and explain the law arising thereon,' and a failure to do so, when properly presented, shall be held for error. When a judge has done this, charged generally on the essential features of the case, if a litigant desires that some subordinate feature of the cause or some particular phase of the testimony shall be more fully explained, he should call the attention of the court to it by prayers for instructions or other proper procedure; but, as stated, on the substantive features of the case arising on the evidence, the judge is required to give a correct *Page 760 
charge concerning it." Jarrett v. Trunk Co., 144 N.C. 301; Matthews v.Myatt, 172 N.C. 233; Lea v. Utilities Co., 176 N.C. 514; Beck v.Tanning Co., 179 N.C. 127; Butler v. Mfg. Co., 182 N.C. 552.
We think his Honor lost sight of this requirement in his instruction concerning manslaughter. In his analysis of C. S., 4200, he drew the distinction between murder committed by means of poison, lying in wait, imprisonment, starving, or torture, and murder committed by any other kind of willful, deliberate, and premeditated killing, and then said: "To illustrate, when the State has shown that a deceased came to his death by means of poison administered at the instance of the party charged, or that he came to his death by reason of lying in wait at the instance of the party charged, then the State does not have to prove other facts to show deliberation, because the statute in its execution, in its construction of language, implies that no such killing could be perpetrated except with malice aforethought, with premeditation and deliberation. All other killing, as you will note, if there is an absence of malice, as defined by the statute, shall be deemed murder in the second degree." To this instruction the defendant excepted. The last paragraph is inaccurate. By "malice as defined by the statute" his Honor perhaps meant the malice which exists when the homicide comes expressly within the statutory definition of murder in the first degree; but the error consists in the additional instruction that all other killing (not all other murder), if there is an absence of such malice, shall be deemed to be murder in the second degree, the logical effect of which was to deprive the defendant of the benefit of such evidence as tended to mitigate the offense to manslaughter. The judge, it is true, had previously called attention to the provision that all murder not in the first degree shall be deemed to be murder in the second degree; but nowhere in the charge was this erroneous use of the word "killing" retracted or corrected, and the jury were therefore left to the uncertainty of conjecture in their application to the evidence of these two contradictory or inconsistent instructions. S. v. Johnson, ante, 637. They may have concluded, very reasonably, that in the absence of such malice as is essential to make a homicide murder in the first degree, every killing of a human being is murder in the second degree. The error was no doubt an inadvertence on the part of the learned judge, but none the less prejudicial for that reason.
We do not intend to suggest that his Honor did not charge the jury as to manslaughter. He did, but in doing so he failed to instruct them as to one of the substantial and essential features of the case, and the defendant excepted. After defining voluntary manslaughter as an "act committed with a real design, a purpose to kill, or through the violence of sudden passion occasioned by an adequate provocation which the law *Page 761 
does not justify or excuse," he said: "In voluntary manslaughter, the killing is in the heat of passion." And as a part of the instruction on the law of self-defense he used this language: "The law is made to fit the ordinary reasonable man. The condition of the nerves of a normal man should govern in apprehension of danger, not what his nerves were, but what they ought to have been, and must be determined from observation of men of ordinary firmness and courage."
In view of these statements, his Honor should have been more specific in his instructions as to manslaughter. For example, although the jury may have found from the evidence that the defendant at the time he fired the fatal shot actually apprehended death or great bodily harm at the hands of the deceased, but that the circumstances were not calculated to excite in the mind of the defendant in the exercise of ordinary firmness reasonable grounds for such apprehension, in consequence of which he shot too hastily or used excessive force, still there was no instruction covering this phase of the evidence. If these facts were found, as probably they were, the jury were again left to conjecture. Under the decision in Merrick's case, the defendant, without submitting a special prayer, was entitled to an explanation of the law applicable to this situation.
Certainly fright or terror will not excuse the unnecessary taking of human life when there is no reasonable ground for apprehending death or enormous bodily harm, but in connection with other circumstances it may serve to repel the inference of malice arising from the intentional killing with a deadly weapon, and to mitigate or reduce the homicide from murder in the second degree or manslaughter. The principle is clearly stated byRiddick, J., in Allison v. State (Ark.), 86 S.W., at page 413: "In each case, then, the question of whether it is proper to submit to the jury the question of the defendant's guilt of any particular grade of offense included in the indictment must be answered by considering whether there is evidence which would justify a conviction for that offense. In this case there was evidence that tended to show that the defendant shot Baldwin because Baldwin cursed him, and then attempted to draw a pistol upon him in a threatening manner. The presiding judge may have concluded that, if the jury believed this evidence, they should acquit, and that therefore that this evidence did not justify an instruction in reference to manslaughter. But the jury may have accepted a part of this evidence as true and rejected other portions of it as untrue. They may have concluded that the defendant shot under the belief that he was about to be assaulted, but that he acted too hastily and without due care, and was therefore not justified in taking life under the circumstances. It is not always necessary to show that the killing was done in the heat of passion to reduce the crime to *Page 762 
manslaughter, for where the killing is done because the slayer believes that he is in great danger, but the facts do not warrant such belief, it may be murder or manslaughter, according to the circumstances, even though there be no passion. Or when the slayer, though acting in self-defense, was not himself free from blame, the crime may be only manslaughter. Wallace v.United States, 162 U.S. 466; 16 Sup. Ct., 859; 40 L.Ed., 1039. The mere fact that a man believes that he is in great and immediate danger of life or great bodily harm does not of itself justify him in taking life. There must be some grounds for such belief, or the law will not excuse him for taking the life of another. But if the slayer acts from an honest belief that it is necessary to protect himself, and not from malice or revenge, even though he formed such conclusion hastily and without due care, and when the facts did not justify it, still, under such a case, although such belief on his part will not fully justify him, it may go in mitigation of the crime, and reduce the homicide from murder to manslaughter. Stevensonv. United States, 162 U.S. 313; 16 Sup. Ct., 839; 40 L.Ed., 980." S. v.Doherty (Vt.), 82 A.S.R., 957; Menly v. State (Texas), 2 S.W. 607;Johnson v. State (Wis.), 5 L.R.A. (N.S.), 815 n. His Honor should have instructed the jury in accordance with this principle.
For the reasons assigned, the defendant is entitled to a
New trial.