[No. B076169. Second Dist., Div. Seven. June 23, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
LEOPOLDO CEJA, Defendant and Appellant.

■■■■■

■■■■■

■■■■■

■■■■■

**COUNSEL**

. Martin Nebrida Buchanan, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Marc E. Turchin and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LILLIE, P. J.**—Leopoldo Ceja appeals from judgment entered following a jury trial in which he was convicted of second degree murder and exhibiting a firearm. (Pen. Code, §§ 187, subd. (a), 417, subd. (b).) The jury found that in connection with the murder, Ceja caused great bodily injury and death by discharging a firearm from a motor vehicle within the meaning of Penal Code section 12022.55, and that he personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a). Ceja contends the trial court committed several instructional errors which were prejudicial, and

that it prejudicially erred in allowing the preliminary hearing testimony of a witness to be read to the jury.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On March 8, 1992, Joe Avila was on the southeast corner of Alondra and Tamarind talking on the phone when defendant approached and asked where he was from.[1] Defendant said, "fuck the '70s and stuff," and Avila responded that he didn't "bang." Avila rode his bike around the corner and defendant followed, driving a blue Escort. When Avila stopped, defendant pointed a gun at him and said he was going to kill him. Avila did not have a gun or any other type of weapon and said something to the effect, "Yeah, go ahead. You tough because you got a gun. That's all." Defendant drove away. About four or five minutes later, Avila heard approximately four shots; he then went to Alondra and Willowbrook thinking someone might have gotten killed, and saw a lot of people and a "guy laying down." An officer took Avila to Compton Boulevard where he identified the defendant.[2]

Rafael Padilla, previously convicted of armed robbery and being an ex-felon with a gun, "used to run" with the "CV-70's" gang. "CV" stands for "Compton Varrio" and is a primarily Hispanic gang with about 200 to 300 members. The CV-70's belong to an area near Willowbrook and Alondra.

On March 8, Rafael Padilla was hanging out and drinking on Caldwell and Alameda when his brother, Juan Padilla, rode up on a bicycle. After drinking at the location for about a half hour, the brothers drove to a liquor store on Willowbrook and Alondra. Several other cars also drove to the liquor store. Rafael Padilla parked his car on the sidewalk and Juan Padilla entered the store. Two or three "home boys" also with CV-70's went into the store; Juan Padilla stayed in the liquor store for no longer than five minutes and then walked out and put a bottle of liquor in someone else's car. He then walked to his brother and Alberto Robles, who were talking, and listened to their conversation. Defendant drove up in a blue Escort automobile and asked the time. Juan Padilla turned around, said "what" and walked towards the car, holding a Corona beer in his hands. He did not point a gun or shoot a gun. Robles walked behind him and Rafael Padilla walked behind Robles. Rafael Padilla was getting ready to look at his watch when he heard some gunshots.

---

[1]Pursuant to Evidence Code section 1291, Avila was declared unavailable as a witness and his preliminary hearing testimony was read to the jury. Ceja does not dispute the trial court's finding that Avila was unavailable as a witness.

[2]During cross-examination at the preliminary hearing, defense counsel established that Avila had never seen defendant before that day, that he saw him for only a short period of time, that the shooting had taken place quite some time ago and that he had not seen who had fired the shots he heard.

As he looked up, he saw his brother falling. Defendant was pursued by Raphael Padilla and subsequently arrested. Juan Padilla died from a gunshot wound to the chest.

Neither Rafael Padilla nor Juan Padilla wore a gun that day. If Juan Padilla had been wearing a gun under his clothing he would have shown it to his brother. CV-70's are also called the " '70s." If someone were to say something like "fuck the '70s" that would be "disrespecting the '70s." Juan Padilla was mellow, not very drunk and not hostile at the liquor store.

Compton Police Officer Roderick Pettus took defendant into custody and searched his car. Pettus recovered a small caliber handgun from underneath the steering column dash and two expended .380 casings, one from the front of the vehicle and the other from the rear of the vehicle. One unexpended round was jammed into the chamber of the firearm and two live rounds were in the magazine inside the weapon.

Compton Police Officer Stoney Jackson collected evidence at the crime scene. No weapon was found, but two expended bullets and one expended .380 caliber casing were found. Jackson inspected the blue Escort automobile, looking for additional casings, bullets, bullet holes, etc. He found no bullets, casings or bullet holes on the exterior or interior of the vehicle. He inspected Rafael Padilla's automobile and found no guns, bullets or expended casings.

During an autopsy of Juan Padilla, the deputy medical examiner recovered a bullet which had been fired from the gun found in defendant's automobile.

*Defense*

Defendant testified that on March 8, he was near the courthouse, somewhere on Raymond, dropping off one of his brother's friends. To get home, he drove north on Tamarind. When he got to Alondra he asked a guy at a pay phone (Avila) "where he was from," because he just wanted to know "where he was from"; he knew he was in the CV-70's neighborhood; he is in a rival gang, the "CV T-Flats." Avila responded, but he (defendant) was listening to the radio and didn't know exactly what was said; he figured Avila was a CV-70 and said, "fuck the '70s" to "disrespect" them; Avila rode off on a bike, and he followed Avila to intimidate and scare him; when Avila stopped, he stopped his car and had a discussion with him and asked why he had to run; when he called Avila a punk, Avila approached, and he pulled out a gun; he did not point it at Avila, just showed it to him, and said to stay right there; he only intended to intimidate and scare Avila.

Defendant further testified he then drove down Raymond and turned right on Willowbrook and drove to Alondra; while on Alondra, a train was passing; since he had to wait for the train, he decided to go to a liquor store and get a soda; while looking for a place to park, three people came out of the store, one of whom asked him, "What do you want, what do you want," so he asked him for the time; while Rafael Padilla looked at his watch, Juan Padilla approached and with his right hand pulled out a revolver from his waistband; he saw the barrel of the gun and got scared, extended his arm and, without aiming, fired three times; he did not want to hurt Juan Padilla but was scared; if Juan Padilla had shot him, he would get killed; he was just defending himself, and fired three rounds; he was not sure if Juan Padilla fired his gun, it happened so fast; he did not shoot at any of the other people in the liquor store; he drove away from the scene because he believed Rafael Padilla would come after him and do something.

Defendant carried a gun for protection; where he lives a lot of things happen; there are a lot of gang-related shootings; rival gangs hate each other; you do not really go into other gangs' neighborhoods, if you do, you might get shot; by going into their neighborhood as a "T-Flat," he was kind of "disrespecting" them, especially by saying, "fuck the '70s"; the store where he shot Juan Padilla was not the same store at which the incident with Avila occurred.

After the shooting, an analysis for gunshot residue was performed on Juan Padilla's hands; a particle of gunshot residue was found on his right hand. There was also a second particle that was consistent with gunshot residue but not unique to it. One can get a particle of gunshot residue on his hand from firing a gun, handling a gun that has residue on it, being in close proximity to a firearm discharge, touching something other than a gun with residue on it, or being touched by someone with residue on his hands. It is unpredictable how much gunshot residue or particles are shot out from a Davis .380, but the defendant's criminalist testified he would expect more than one particle. He said the shot itself produces thousands of particles; if someone fired a gun there is probably a good chance that someone would have more than one particle deposited at the time of a shot; whether more than one particle could be identified at some later time when the samples are taken is another question; he has examined samples from suspected shooters where only one or two particles were found.

An analysis of a blood sample taken from the victim revealed the blood contained ethanol and cocaine. Ethanol is drinking alcohol. The blood-alcohol level was 0.13 grams percent; the cocaine level was 0.06 micrograms per milliliter and the metabolite was 0.84 micrograms per milliliter.

Metabolite is a breakdown product of cocaine. When ethanol and cocaine are taken at the same time, there is a possibility of a drug being formed called ethyl cocaine or cocaethylene. The influence or the effect of the substances is potentiated or increased.

Dr. Terence McGee testified that a combination of cocaine and alcohol prolongs the effect of the substances, and the effects of such a combination are much greater than the effect of either substance singularly. One with a combination of the drugs in his system would have much more of a tendency to "fly off the handle," or do things that might not occur to him in a sober state. If a person has a tendency towards being hostile, the combination of substances would "throw fuel on the fire." It would not be uncommon for such persons to be calm in their demeanor at one moment in time and the next moment be aggressive.

I

JURY INSTRUCTIONS RE VOLUNTARY AND INVOLUNTARY MANSLAUGHTER

█ With respect to the murder count, appellant contends the trial court committed reversible error by failing to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter. This contention is well taken.

The jury was instructed on justifiable self-defense as a complete defense to the murder charge. The court, however, refused to give voluntary manslaughter instructions, finding there was no evidence to warrant such instructions. Defendant argued the voluntary manslaughter instructions would be appropriate if the jury should find defendant's belief in the need for self-defense was honest but unreasonable.

█ A trial court must instruct the jury on every theory that is supported by substantial evidence and does not err when it refuses to instruct on theories not so supported. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr. 84, 603 P.2d 1].) Substantial evidence is evidence from which a reasonable jury could have concluded " 'that the particular facts underlying the instruction did exist.' [Citation.]" (*People* v. *Lemus* (1988) 203 Cal.App.3d 470, 477 [249 Cal.Rptr. 897].) Where the theory is that the defendant committed a lesser included offense, the court must instruct on the lesser included offense when there is evidence from which a rational trier of fact could conclude beyond a reasonable doubt, the defendant was guilty of the lesser crime. (*People* v. *Glenn* (1991) 229 Cal.App.3d 1461, 1465 [280 Cal.Rptr. 609].)

■ "To be exculpated on a theory of self-defense one must have an honest *and* reasonable belief in the need to defend. [Citations.] A bare fear is not enough; 'the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.' [Citation.]" (*People* v. *Flannel, supra,* 25 Cal.3d at pp. 674-675, italics in original.)

A genuine but unreasonably held belief in the need to defend negates the malice and reduces the offense to manslaughter. (25 Cal.3d at p. 680.) The California Supreme Court in the very recent case of *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574] upheld the continued viability of imperfect self-defense and concluded that "[w]hen the trier of fact finds that a defendant killed another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and cannot be convicted of murder." (*Id.* at p. 783; see also *People* v. *De Leon* (1992) 10 Cal.App.4th 815, 821-825 [12 Cal.Rptr.2d 825].)

"A person who kills another in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury may be guilty of voluntary or involuntary manslaughter depending on the existence of an intent to kill. [Citations.]" (*People* v. *Glenn, supra,* 229 Cal.App.3d at p. 1467.)

■ While defendant testified that the victim pulled a gun from his waistband and that defendant saw the barrel of the victim's gun before defendant shot the victim, no gun was found at the scene and prosecution witnesses testified that the victim did not have a gun. Additionally, defendant testified he did not want to hurt the victim but was frightened. The jury was entitled to accept portions of a witness's testimony and to disbelieve other portions (see *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67-68 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059]) and might well have concluded that defendant was mistaken about the victim being armed but also have concluded that defendant honestly but unreasonably believed his life was in danger, making the killing at most voluntary or involuntary manslaughter. (See *People* v. *Glenn, supra,* 229 Cal.App.3d at p. 1467.)

■ The failure to instruct on the lesser included offense cannot be deemed harmless. " '[I]t is reversible error to refuse a manslaughter instruction in a case where murder is charged, and the evidence would warrant a conviction of manslaughter.' [Citations.]" (*People* v. *Edwards* (1985) 39 Cal.3d 107, 116 [216 Cal.Rptr. 397, 702 P.2d 555].) ■ Moreover, the factual questions posed by the omitted instructions were not necessarily

resolved adversely to defendant under other, properly given instructions. (*Id.* at pp. 116-117.)

## II

### Preliminary Hearing Testimony

█ Appellant contends the trial court violated his Sixth and Fourteenth Amendment rights to counsel and due process by admitting the preliminary hearing testimony of Joe Avila without first holding a hearing on the competence of defense counsel at the preliminary hearing. This contention is without merit.

"Evidence Code section 1291, subdivision (a), provides, in pertinent part: 'Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' " (*People* v. *Zapien* (1993) 4 Cal.4th 929, 974 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

█ "Both the state and federal Constitutions guarantee criminal defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The right of confrontation is not absolute, however; in particular, it does not preclude the prosecution from proving its case through the prior testimony of a witness who is unavailable at trial, so long as the defendant had the right and the opportunity to cross-examine the witness during the earlier proceeding at which the witness gave this testimony. [Citations.]" (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 618 [25 Cal.Rptr.2d 390, 863 P.2d 635].) "As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity. [Citations.]" (*People* v. *Zapien, supra,* 4 Cal.4th at p. 975.)

█ Appellant's claim that he was denied the opportunity to effectively cross-examine in that his counsel at the preliminary hearing was ineffective is not supported by this record. █ In order to establish that a defendant has been denied effective assistance of counsel, a court must conclude that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that but for counsel's unprofessional errors, the result

of the proceeding would have been different. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 677 [276 Cal.Rptr. 788, 802 P.2d 278].) During cross-examination, witness Avila was asked questions which attempted to show that his identification of the defendant was incorrect, that he had only seen defendant for a short period of time, and that a long time had passed since the incident had occurred. Additionally, with reference to the murder charge, Avila testified he had not seen who had fired the fatal shots. In arguing that he should be allowed a hearing to determine the effectiveness of the preliminary hearing counsel, trial counsel could not say what questions should have been asked on cross-examination at the preliminary hearing or that he in fact would have asked those questions. On this record, appellant has failed to establish that he was denied effective assistance of counsel for purposes of cross-examining witness Avila at the preliminary hearing.[3]

## III

### JURY INSTRUCTION REGARDING REASONABLE DOUBT

 Appellant contends the trial court committed prejudicial error and violated his constitutional rights when it instructed the jury on the presumption of innocence and proof beyond a reasonable doubt in accordance with CALJIC No. 2.90.

The United States Supreme Court in *Victor* v. *Nebraska* (1994) __ U.S. __, __ [127 L.Ed.2d 583, 597, 114 S.Ct. 1239], filed March 22, 1994, has squarely rejected this contention.

### DISPOSITION

The judgment of conviction for second degree murder is reversed and the cause remanded to the superior court with directions to enter a judgment of guilty of involuntary manslaughter if the prosecutor consents to forego prosecuting defendant for second degree murder and to resentence defendant accordingly; or, in the alternative, to set the cause for retrial if the prosecutor does not so consent. In all other respects the judgment is affirmed.

Woods (Fred), J., concurred.

JOHNSON, J.—I wholeheartedly concur in the judgment and my colleagues' holding on the imperfect self-defense issue—so far as it goes. I write separately solely to register my view a trial court must also instruct on

---

[3]As an offer of proof, trial counsel sought to demonstrate to the court that the lawyer that handled the preliminary hearing "never read the reports, didn't know the elements of the offenses, didn't know the exposure, never spoke to the witnesses." The privately retained attorney at the preliminary hearing was subsequently replaced by appointed counsel.

"imperfect self-defense" whenever it determines a "perfect self-defense" instruction is appropriate. In explaining my reasons, it will be helpful to begin with self-defense, both the perfect and imperfect varieties.

California Penal Code section 197, subdivision 3 makes the killing of a person justifiable if committed ". . . when there is reasonable ground to apprehend a design . . . to do some great bodily injury, and imminent danger of such design being accomplished; . . ." (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 241, p. 277; CALJIC No. 5.12; *People* v. *McDonnel* (1949) 94 Cal.App.2d 885 [211 P.2d 910].) When this "actual" and "reasonable" belief exists it constitutes an absolute defense, relieving the defendant of criminal responsibility for the homicide.

As the majority explains, the courts also have recognized a related mental state which reduces, but does not eliminate, the defendant's culpability. It is usually called "imperfect self-defense." The California Supreme Court fully explained this concept in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) "An *honest but unreasonable* belief that it was necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (*Id.* at p. 674, original italics omitted, new italics added.)

Again in a very recent and exhaustive opinion, the California Supreme Court further refined and upheld the continued viability of "imperfect self-defense." (*In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574].) Quoting extensively and approvingly from this court's opinion in *People* v. *De Leon* (1992) 10 Cal.App.4th 815 [12 Cal.Rptr.2d 825], the Supreme Court concluded the Legislature did not eliminate "imperfect self-defense" when it abolished the "diminished capacity defense" in 1981. (7 Cal.4th at pp. 776-778.) The high court did, however, alter somewhat the terminology used to define "imperfect self defense." "Although *Flannel* and other opinions referred to an 'honest belief' we shall use the more precise term '*actual belief*' because it avoids the confusing suggestion inherent in the phrase 'honest belief' that a person could have a 'dishonest belief', i.e., that a person could believe something he does not believe." (7 Cal.4th at p. 773, italics in original.)

The trial court's decision to instruct on self-defense but not on imperfect self-defense in this case may have been based on its misunderstanding of an admittedly subtle distinction—how mistakes of fact affect the doctrine of self-defense itself. LaFave & Scott offer this explanation: "When his *belief is reasonable* . . . he may be *mistaken* in his belief and still have the *defense*. Thus one may be justified in shooting to death an adversary who, having

threatened to kill him, reaches for his pocket as if for a gun, though it later appears that he had no gun and that he was only reaching for his handkerchief." (LaFave & Scott, Criminal Law (2d ed. 1986) Justification & Excuse, § 5.7(c), p. 457, italics added.)

While a defendant may be mistaken and still claim self-defense, that mistake must be *reasonable*. (See *State* v. *Kelly* (1984) 97 N.J. 178 [478 A.2d 364, 373]; *State* v. *Vasquez* (1993) 265 N.J.Super. 528 [628 A.2d 346, 356].) An actual but unreasonable mistake about the threat of imminent peril, on the other hand, would not support self-defense yet would support imperfect self-defense. The imperfect self-defense doctrine allows for a situation where a reasonable person would not conclude a set of keys held in the victim's hand was a gun, but the jury nonetheless could decide the defendant actually but unreasonably held such a belief.

In one sense, imperfect self-defense is a "lesser included" defense of perfect self-defense. They share common elements—the defendant killed because of an "actual" belief he was in imminent danger of death or great bodily injury. Perfect self-defense, however, requires proof of an additional element—the defendant's belief was reasonable. For this reason, one cannot establish the elements of perfect self-defense without proving imperfect self-defense. For this same reason, if there is sufficient evidence of all the elements required to justify a perfect self-defense instruction, by definition there is sufficient evidence supporting an instruction for the "lesser included" defense of imperfect self-defense.

This is the logic which impelled our disposition of this issue in *People* v. *De Leon, supra,* 10 Cal.App.4th 815. The Attorney General argues adherence to this court's decision in *De Leon* requires trial courts to instruct on imperfect self-defense whenever they instruct a jury on self-defense. In this, the Attorney General is correct. In my view, this is what *De Leon* indeed requires. In criticizing this position, however, the Attorney General claims "such a requirement has never been articulated by any court . . . ." In this assertion the Attorney General is incorrect.

While *De Leon* is the only California case I have found which clearly states this requirement, our decision does not stand alone in its reasoning. LaFave & Scott state "[w]here this 'imperfect' right of self-defense is recognized, it is generally the case that whenever the facts would entitle the defendant to an instruction on self-defense regarding a murder charge, an instruction on this variety of manslaughter should also be given. [Fns. omitted.]" (Lafave & Scott, *supra,* Crimes Against the Person, § 7.11(a), p. 666.)

The first judicial decision my research uncovered implying a necessary tie between instructing on self-defense and manslaughter was decided by the

Supreme Court of North Carolina in 1922, over 70 years ago. (*State* v. *Thomas* (1922) 184 N.C. 757 [114 S.E. 834].) Since that time, several other states have expressly articulated this requirement.[1] The Supreme Court of Wisconsin has decided ". . . it is inconsistent and reversible error to deny the imperfect self-defense instruction where an instruction is given as to perfect self-defense." (*State* v. *Gomaz* (1987) 141 Wis.2d 302 [414 N.W.2d 626, 630].)

The Illinois Supreme Court expresses their requirement as ". . . a self-defense and a voluntary manslaughter instruction should be given when any evidence is presented showing the defendant's subjective belief that use of force was necessary. If the subjective belief is reasonable, the result is justifiable use of force; if the subjective belief is unreasonable, the result is voluntary manslaughter. [Citations.] [¶] The determination of whether the defendant's subjective belief is reasonable is for the jury to make." (*People* v. *Lockett* (1980) 82 Ill.2d 546 [45 Ill.Dec. 900, 413 N.E.2d 378, 381].) The Maryland Court of Special Appeals also has addressed the issue, stating, "[i]t is difficult to envision circumstances which are sufficient to generate the issue of justification or excuse by way of perfect self-defense which do not also generate the issue of mitigation by way of imperfect self-defense. Generally, if a defendant is entitled to an instruction with respect to the former, he will be entitled to an instruction with respect to the latter." (*Faulkner* v. *State* (1983) 54 Md.App. 113 [458 A.2d 81, 84, fn. 5].)

I do not mean to suggest appellant has established "imperfect self-defense" as a matter of law. On the evidence presented, a jury reasonably could have found neither self-defense nor imperfect self-defense applied. As my colleagues also recognize, the problem is the jurors were not given the opportunity to consider the latter, since the court failed to even instruct on imperfect self-defense while it did instruct on self-defense itself.

In my view, *De Leon* gave expression in California to a sound, eminently logical principle which has gained wide acceptance elsewhere. In this and future cases where trial courts find sufficient reason to give an instruction on perfect self-defense, they also should grant a requested instruction on imperfect self-defense.

---

[1]While the definitions of self-defense and imperfect self-defense may differ slightly from state to state, they are close enough to the California definitions to be persuasive authority on this issue.