Filed 6/24/15  P. v. Matador CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE LUIS MATADOR,<br><br>    Defendant and Appellant. | F067650<br><br>(Super. Ct. No. MCR041345)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Defendant Jose Luis Matador appeals from convictions for attempted murder and participation in a criminal street gang with related gun use and gang enhancements.

Matador relied on a self-defense theory at trial. The trial court instructed the jury with perfect self-defense instructions, but did not instruct the jury on imperfect self-defense or attempted voluntary manslaughter. Matador contends it was error for the trial court not to give an instruction on imperfect self-defense. We disagree and affirm the judgment.

## PROCEDURAL BACKGROUND

On May 21, 2013, a jury found Matador guilty of attempted murder. (Pen. Code,[1] §§ 664, 187, subd. (a), count 1). The jury found true special allegations that Matador premeditated the commission of the offense, committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and personally used a firearm in the commission of the offense (§§ 12022.53, subds. (b), (c), 12022.5, subd. (a)(1)). The jury also found Matador guilty of participation in a criminal street gang (§ 186.22, subd. (a), count 2) and found true a special allegation that Matador personally used a gun during the commission of the offense (§ 12022.5, subd. (a)).[2]

On July 12, 2013, the trial court sentenced Matador on count 1 to an indeterminate prison term of 15 years to life for attempted murder. The court sentenced Matador to a consecutive determinate term of 20 years for the section 12022.53, subdivision (c) firearm enhancement. The court stayed Matador's sentence for participating in a street gang pursuant to count 2. The court also stayed Matador's sentence for the gang enhancement and the gun enhancements alleged in sections 12022.5, subdivision (a)(1) and 12022.53, subdivision (b). The court granted presentence custody credit of 737 days for time in custody, 110 days of conduct credits, and total custody credits of 847.

## FACTS

### Prosecution

Manuel was shot in the head just before midnight on July 6, 2011. The bullet grazed the side of Manuel's head, slipped under the skin, and came to rest between the

---

[1]Unless otherwise designated, all statutory references are to the Penal Code.

[2]Prior to jury deliberations, the trial court granted Matador's motion for acquittal on a great bodily injury enhancement (§ 12022.7, subd. (a)) alleged as to both counts.

2.

scalp and the skull.  Manuel was taken to the hospital where the bullet was removed and the wound was closed with staples.  He was released the same night with no other injury.

Manuel testified that he was shot by his friend, Matador, as they walked home together.  Manuel and Matador were associated with the MS13 gang, also known as the Mara Salvatrucha.  Photographs of Manuel, Matador and other gang members or associates throwing gang signs together were admitted into evidence.  Manuel testified he was not a member of the gang and worked a lot with the gang task force.  Manuel said he was photographed with members of the gang to be accepted by them and as part of the investigations he was involved with.

An investigator with the California Department of Justice testified Manuel was activated as an informant in 2009.  He was subsequently deactivated and reactivated. Manuel sought financial support, but the investigator did not remember him getting paid. Manuel was first shot while driving on March 2011.[3]  The bullet hit Manuel in the head, but did not cause him enough injury for him to go to the hospital.  The bullet had just grazed his head.  Manuel cooperated with the investigating officer.  He was supposed to testify for the prosecution in July 2011.

Officer Robert Hill of the Madera Police Department received a report on March 31 that Manuel had had a gun brandished at him.  Hill received another report on April 11 that Enrique Ruvalcaba and Manuel had been shot at.  Suspect Jonathan Price was later arrested for that shooting.  Manuel and Ruvalcaba were cooperative during the investigation of the Price case.

In May or early July, Hill received information from Manuel that Manuel had been "greenlighted."  According to Hill, greenlighted meant a person had done something wrong to the gang and the gang could shoot or beat up the person, or kick the person out of the gang.  Hill tried to get Manuel relocated.

---

[3]Hereafter the dates of events refer to the year 2011.

3.

Manuel believed he was greenlighted because someone in the MS13 gang wanted him killed. He was not sure who wanted this or why. Manuel tried to remove a gang tattoo from his hand because immigration was accusing him of being a member of a gang, but he managed to remove only part of it.

On the evening of July 6, Manuel was with Matador, Enrique Ruvalcaba, and another man in Ruvalcaba's apartment. Manuel had arrived that evening with his son, but sent his son home between 8:00 and 9:00 p.m. Ruvalcaba initially did not talk to Manuel that evening and later insulted him and called him a "bitch." About 11:00 or 11:30, Manuel wanted to go home. Usually, Ruvalcaba gave Manuel a ride home. This night Ruvalcaba refused to give Manuel a ride and had Matador accompany Manuel as he walked home.

Matador walked behind Manuel on the way home. As they approached Manuel's home, Manuel turned around and saw Matador walking closer to him, about two or three arm lengths apart. As Manuel was walking, he heard a shot fired from behind him. Immediately afterward, Manuel heard a second shot. When Matador shot Manuel the second time, Manuel was crossing the street and fell to his knees on the ground.

There was a third shot. As Manuel grabbed Matador's hands, Matador put the gun in Manuel's face and fired the gun once more. Manuel bit Matador's arm on the biceps between the elbow and the shoulder. Manuel tossed Matador to the side and began to run. Matador was holding his hands out from his body in a gesture Manuel took to mean "why don't you die."

Maria Ruvalcaba is Enrique Ruvalcaba's mother. Manuel went to Maria Ruvalcaba's house. Manuel called her "Mom" and told her "they" had shot him. Manuel could not remember whether Maria Ruvalcaba called the police or got the phone for him to call the police. During the 911 call, Maria Ruvalcaba initially reported her son had been shot. Manuel got on the phone and said he had been shot in the head. Manuel told the dispatcher to hurry up and to notify Officer Hill. When asked who shot him, Manuel replied it was one of his friends, Jose Matador.

4.

Martha Melgoza lived in the same apartment complex as Maria Ruvalcaba. On the evening of July 6, she saw men outside the apartment "talking violent." She heard one man say, "I told him what's up, I'm going to shoot his a-s-s." Melrose did not report this statement to investigators the evening of the shooting. Melgoza later heard four or five shots fired.

Enrique Ruvalcaba spoke to the police and confirmed that Manuel and Matador had been at his mother's home that evening. Later that night Ruvalcaba got a call from Matador asking for a ride to the hospital because he had been shot. When Ruvalcaba asked if Matador was joking, Matador replied that it was cool and he hung up.

### Defense

Matador's sister, Paloma Matador, testified that she had known Manuel from 2006 by his gang moniker. Paloma Matador said Manuel introduced himself as an MS13 leader and recruited members for the gang. In a photograph of three men identified by Paloma Matador, her brother was flashing gang signs with Enrique Ruvalcaba (also known as "Happy"), and Manuel.

Matador testified in his own defense and acknowledged being a member of the MS13 street gang. He was "jumped" into the gang when he was 15 years old. Manuel was one of the three people who jumped Matador into the gang. Matador's gang moniker was "Hollywood." Matador was aware Manuel had been shot at earlier in 2011 but he was not aware Manuel was an informant for a gang task force. Matador considered his relationship to Manuel to be close.

It was a five-minute walk from Manuel's residence to Enrique Ruvalcaba's residence. Matador lived close to Manuel. On July 6, Manuel arrived at Enrique Ruvalcaba's home with his child. According to Matador, no one was angry with Manuel. Matador went out to buy beer. He was gone five or ten minutes.

That day, Manuel gave Matador orders to confront people who were walking by to find out if they were enemies. Nothing happened, so they went back to the Ruvalcaba

5.

home.  Matador decided to go home between 11:00 and 11:30.  Matador walked home with Manuel.  Matador said that no one asked Enrique Ruvalcaba for a ride.

As they walked, Matador said Manuel told him to leave his girlfriend because she had family who were members of a Norteño gang, and this could cause problems because they did not get along with MS13.  Manuel explained to Matador that he had to leave his girlfriend because if something happened to Matador, Manuel had "to stick in" for him.  Matador told Manuel not to worry because it was Matador's problem.  As Manuel kept pressing this point, Matador said he called him a crybaby.  Manuel asked Matador what he called him.  Matador told Manuel he called him a crybaby.  Matador turned away and kept walking.

Matador was a couple of steps away from Manuel to his side.  According to Matador, Manuel quickly pulled out a gun from his shorts.  Matador had not seen Manuel with a gun beforehand.  As Matador described it:  "That fool just pulled [it] out like that, so … my reaction was just to grab it, his arm and start fighting with him.  The gun went off, started going off.…  He fell to the ground."  Matador said he was then in back of Manuel, "so I just stopped once he was on the ground."  According to Matador, Manuel got up and started running.

Matador thought he had been shot in the arm because he felt a burning sensation.  Matador was not sure how long he had been struggling, but said it felt like it was forever.  Manuel had never pulled a gun out on Matador before and Matador was scared.  Matador explained that while the gun was going off, both of their hands were on the gun.  It was dark, so Matador could not tell if Manuel had been shot or injured.

Matador stood in place for a minute thinking about what had happened.  He then walked away with the gun.  When he got close to his house, Matador threw the gun away.  Instead of calling the police, Matador called Enrique Ruvalcaba and told him he thought he had been shot and needed to go to the hospital.  Then Matador decided he was alright and said he would tell Ruvalcaba what happened later.

6.

The police went to Matador's home the next morning to talk to him. Matador admitted he did not tell them the truth about what happened. Matador lied to the police about the bite mark on his arm and his whereabouts the evening before because a gang member is not supposed to point fingers when something happens. Matador testified he did not get drunk the day of the shooting. Matador admitted he lied about his girlfriend biting his arm. The bite happened during Matador's struggle with Manuel. After the incident, Matador mistook the bite for a bullet wound.

Matador explained he lied to the police during questioning because he thought they had lied to him. He also lied because he was a gang member and did not want to cooperate with the police investigation.

## Rebuttal

Officer Hector Garibay questioned Matador the morning after the shooting. The police questioning of Matador was recorded on a CD, transcribed, and played for the jury at trial. During questioning, Matador told police he could not remember when he heard about the shooting because he was drunk the night of the shooting after drinking High Gravity. Matador was "hanging out" with Manuel and Enrique Ruvalcaba. They left the Ruvalcaba residence between 11:00 and 12:00 p.m. Ruvalcaba drove them to a church close to where Matador's girlfriend lives.

The police informed Matador they had a witness who saw him behind the gun that was fired. Matador said he did not do it. The officers told Matador he had a bite on his right biceps where Manuel said he had bitten Matador. Matador said, "I didn't do shit," and "I was with my girl and that's it." When asked to explain the bite mark on his biceps, Matador replied he had been with his girlfriend.

## Self-Defense Instruction

The jury was instructed on perfect self-defense with CALCRIM No. 505 as follows:

> "The defendant is not guilty of attempted murder if he was justified in attempting to kill someone in self-defense. The defendant acted in lawful self-defense if:

7.

"1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury;

"2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

"AND

"3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the attempted killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death/great bodily injury has passed. This is so even if safety could have been achieved by retreating.

"The People have the burden of proving beyond a reasonable doubt that the attempted killing was not justified. If the People have not met this burden, you must find the defendant not guilty of attempted murder."

## DISCUSSION

**Alleged Instructional Error**

The trial court instructed the jury on attempted murder and perfect self-defense, but not on attempted voluntary manslaughter and imperfect self-defense. Matador contends the trial court erred in failing sua sponte to instruct the jury with the imperfect

self-defense instruction for attempted voluntary manslaughter in addition to the standard self-defense instruction.

Even in the absence of a request from the defendant, in criminal cases the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.) California law places a sua sponte duty on the trial court to instruct fully on all lesser necessarily included offenses that are supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149 (*Breverman*).)

Murder is the unlawful killing of a human being with malice aforethought. A defendant who commits an intentional and unlawful killing and who lacks malice is guilty of voluntary manslaughter. Generally, the intent to kill constitutes malice. In limited and explicitly defined circumstances, a defendant who intentionally and unlawfully kills lacks malice. Examples of this are when a defendant acts in a sudden quarrel or heat of passion, or when a defendant kills in unreasonable self-defense. Unreasonable self-defense occurs when a defendant has an unreasonable but good faith belief that he or she has to act in self-defense. (*People v. Breverman*, *supra*, 19 Cal.4th at pp. 153-154.) Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the malice element of homicide, voluntary manslaughter is considered a lesser necessarily included offense of intentional murder. (*Id*. at p. 154.)

Neither heat of passion nor imperfect self-defense constitutes an element of voluntary manslaughter that is affirmatively proven. They are theories of partial exculpation that reduce murder to manslaughter by negating the element of malice. (*People v. Moye* (2009) 47 Cal.4th 537, 549; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116.) For attempted killing to be in self-defense, the defendant must have an actual and reasonable belief in the need to defend. If the belief subjectively exists but is objectively unreasonable, there is so-called imperfect self-defense where the defendant is deemed to

9.

have acted without malice and cannot be convicted of murder. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

Appellant relies on authorities reasoning that where there is substantial evidence of a defendant's need for self-defense, there will necessarily be substantial evidence in support of imperfect self-defense. The authorities cited by Matador, however, either included specific evidence of imperfect self-defense, or presented no evidence of perfect or imperfect self-defense. (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 [finding imperfect self-defense necessarily present where self-defense instruction is given, uncertainty around events of shooting factually supported theory of imperfect self-defense]; *People v. Ceja* (1994) 26 Cal.App.4th 78, 85-86, overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 92-94 [finding defendant's mistaken but actual belief that victim pulled out a gun presented evidence of imperfect self-defense and justified instructions on involuntary manslaughter]; *People v. De Leon* (1992) 10 Cal.App.4th 815, 824 [adopts defendant's argument that where perfect self-defense is present imperfect self-defense is also present, but finds no evidence of an honest belief in the need for self-defense whether perfect or imperfect].)

In *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1271-1276, this court confronted an assertion that the defendant was entitled sua sponte to instructions on imperfect self-defense when instructions were given for perfect self-defense. We found there was no evidence in the record to support an instruction on imperfect self-defense. (*Id.* at pp. 1274-1276.) We further rejected the suggestion in *Ceja* and *De Leon* that imperfect self-defense instructions must be given whenever perfect self-defense instructions are warranted by the evidence. (*People v. Rodriguez*, *supra*, at p. 1273.)

The California Supreme Court reviewed the doctrine of imperfect self-defense in *People v. Manriquez* (2005) 37 Cal.4th 547, 581. The doctrine is applicable when a defendant had an actual but unreasonable belief he or she was in imminent danger of death or great bodily injury and had been deemed to have acted without malice; the defendant can, therefore, only be convicted of voluntary manslaughter. Elaborating on

10.

this doctrine, *Manriquez* held "imperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter.  Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter."  (*Ibid.*)

*Manriquez* further found that if imperfect self-defense were a true affirmative defense, instructions would be required only if the defendant was relying on the defense or there was substantial evidence supporting the defense, and the defense was not inconsistent with the defendant's theory of the case.  The court in *Manriquez* explained self-defense is a narrow doctrine requiring without exception that the defendant must have "'an *actual* belief in the need for self-defense.'"  Fear of future harm does not suffice and "'the defendant's fear must be of *imminent* danger to life or great bodily injury.'"  (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 581.)  An imminent peril is one that must be dealt with instantly.  *Manriquez* reiterated that as with perfect self-defense, or any defense, trial courts are required to give instructions for imperfect self-defense only where there is substantial evidence to support the defense.  (*Ibid.*, citing *In re Christian S.* (1994) 7 Cal.4th 768, 783 and *People v. Aris* (1989) 215 Cal.App.3d 1178, 1192.)

We note the authorities cited by Matador—*Ceja*, *De Leon*, and *Viramontes*— either included evidence of imperfect self-defense, or included no evidence of perfect or imperfect self-defense.  To the extent these authorities suggest that wherever there is evidence of perfect self-defense there is necessarily evidence of imperfect self-defense and the defendant is entitled therefore to voluntary manslaughter instructions, we find this suggested rule by the above cited authorities was rejected by our court in *Rodriguez* and by the California Supreme Court in *Manriquez*.  The holdings of our Supreme Court are binding on appellate and trial courts in California.  (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  We therefore reject Matador's contention

that if he is entitled to a perfect self-defense instruction, he is necessarily entitled to an imperfect self-defense instruction.

We turn to the evidence adduced at trial to determine whether there was evidence supporting an imperfect self-defense instruction. Manuel testified Matador was standing behind him and to his side as they walked home. Matador then moved closer to Manuel, pulled out a gun, and started shooting. Matador was close enough for Manuel to struggle with him after the shooting began. During the struggle, Manuel bit Matador in the upper arm, ran down the street, briefly fell to his knees, and made his way to the Ruvalcaba home.

Matador testified that as he and Manuel walked home, they got into a discussion that turned into a dispute over whether Matador should stay with his girlfriend. According to Matador, Manuel pulled out a gun from his shorts and the two men began to struggle over it. Matador explained both men had a hand on the gun when it started firing. During the struggle, Matador felt pain in his arm and thought he had been shot. Matador later discovered that he had not been shot, but Manuel had bitten his right biceps. Matador said he was still holding the gun after the incident and threw it away.

We agree with the People that Matador's account of events could only be perfect self-defense. There was a gun present and used at the scene of the shooting. This was not a case where the defendant mistakenly believed the other party had a gun. Four or five rounds were fired from the gun, Manuel sustained an injury and Matador initially thought he was shot during a struggle over the gun.

If the jury believed Matador's account of the struggle, then it could only have found he was fighting for his life and the gun was fired during the struggle over it. Matador's account of the incident did not include an actual but unreasonable belief on his part that he could be killed or suffer great bodily injury. Under Matador's account of events, he did nothing to provoke Manuel, he was confronted with a gun, and he immediately struggled with Manuel to protect his own life. Matador's description of events can only constitute perfect self-defense.

12.

Furthermore, there is no evidence from Manuel's testimony that can be construed to support a theory of imperfect self-defense. In Manuel's account of events, he did nothing provocative to Matador and was walking down the street when Matador pulled out a gun and immediately starting shooting. Manuel did not bite Matador until *after* the shooting started. Manuel's attempt to protect himself could not have been provocation for Matador to begin to shoot at Manuel.

The jury was faced with two different descriptions of how the gun was fired. If it believed Matador's testimony, Matador was engaged in perfect self-defense and the jury was instructed on this theory. There is no evidence in the record of imperfect self-defense and the trial court did not err in failing to give instructions on voluntary manslaughter and imperfect self-defense. (*Manriquez, supra*, 37 Cal.4th at p. 581; *People v. Rodriguez, supra*, 53 Cal.App.4th at pp. 1274-1276.) Because we find no instructional error under the facts of this case, we do not reach the parties' argument evaluating whether the alleged error was harmless.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
DETJEN, Acting P.J.


_____
FRANSON, J.

13.