Filed 7/9/25  P. v. Whitaker CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVIONE ANTOINE WHITAKER,<br><br>    Defendant and Appellant. | D083645<br><br><br>(Super. Ct. No. SCD289749) |

APPEAL from a judgment of the Superior Court of San Diego County, Aaron H. Katz, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Davione Antoine Whitaker of second degree murder and possession of a weapon in a penal institution, and found true a personal firearm-use sentencing enhancement allegation.  The trial court sentenced

Whitaker to 15 years to life for the murder conviction, a consecutive 10-year term for the firearm enhancement, and a consecutive three-year term for the weapon possession conviction.

On appeal, Whitaker asserts the trial court erred by failing to instruct the jury on voluntary manslaughter based on imperfect self-defense and provocation after he initially rested his case.  Further, Whitaker contends this decision compelled him to testify, which constituted a violation of his Fifth Amendment rights.  Additionally, Whitaker challenges the trial court's denial of his request for a pinpoint jury instruction explaining that the "character of the weapon" does not determine "the degree of the offense."  As we shall explain, we reject these arguments and affirm the judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution's Case*

At the time of the murder, Jonathan R. and his fiancée, Jacquela R., lived in an apartment on 47th Street.  The victim, Bobby Brown, was Jacquela's stepfather.  Jonathan and Brown were friends; Jonathan drove Brown to work daily.  In the early evening on April 2, 2021, Brown went to the couple's apartment to pick up an extra cell phone that Jonathan planned to give Brown.  When Brown reached the apartment, Jonathan was not home, so Brown played with Jacquela's two young children.  Jacquela did not notice anything out of the ordinary with Brown.

When Jonathan got home, he and Brown went to AutoZone to buy some brake fluid and oil for Brown's car.  Jonathan testified nothing seemed wrong or out of the ordinary with Brown.  When they returned, Jonathan parked in front of his apartment.  Jonathan noticed Whitaker sitting on a wall close to where he parked, smoking a cigarette and looking around.  Whitaker was

wearing a burgundy hooded sweatshirt and dark sweatpants and shoes. Jonathan had never seen Whitaker before. Neither Jonathan nor Brown spoke to or interacted with Whitaker. However, they discussed whether they thought Whitaker looked dangerous, and they decided he was not a threat.[1]

Jonathan headed up the stairs to his apartment and Brown walked to his car, which was parked in a nearby cul-de-sac. As soon as Jonathan closed the door to the apartment, he heard three gunshots. Jonathan looked outside and saw Brown and Whitaker in a physical struggle. He yelled to Jacquela that it was Brown, and they both ran down the stairs. Brown and Whitaker were in between Brown's car and another car parked parallel to and toward the rear of Brown's car, a blue Toyota Camry. Jacquela testified the men were initially upright and wrestling, and she thought Whitaker was trying to get the upper hand and Brown was trying to fight back. Eventually, the men fell to the ground, and Whitaker was on top of Brown. Brown was trying to defend himself by holding Whitaker's hands and trying to push him back

When Jacquela reached the men, she kicked Whitaker in his face. Jacquela and Jonathan then grabbed Whitaker—Jacquela had her arms wrapped around Whitaker while Jonathan held him down. Whitaker was

_____

[1] This discussion occurred because in the weeks prior to the shooting, a former roommate of Jonathan and Jacquela's, J.E., had threatened Jonathan and his family. On March 22, 2021, Jacquela told Brown that J.E. said Brown would be the first one he would take out. On March 24, J.E. shot into the window of Jonathan and Jacquela's apartment while the family was home; the bullet went above the heads of Jonathan and the child he was holding, but no one was injured. Jacquela told Brown what happened. Jonathan testified that on the day of the shooting, he and Brown considered whether Whitaker, who they had never seen before, could be connected to J.E., but decided that Whitaker's presence was nothing to worry about. No evidence was presented that Whitaker knew or was connected in any way with J.E.

reaching for something in his sweatshirt pocket, prompting Jonathan to ask where the gun was. Brown said that it was in front of the car. Brown also said he was shot, and Whitaker said he was shot.

Whitaker, who was temporarily separated from Brown, lunged back toward him. Jonathan grabbed Whitaker and "tossed him" away. Jonathan went to get the gun from the ground, then saw a police car heading toward them. Whitaker started running from the scene and Jonathan heard him say, "I was just asking for a cigarette." Jonathan ran after Whitaker, and stopped when he reached the police car. Jonathan told the officer that Brown had been shot and the shooter was on the run.

The officer continued to where Brown was lying, and found Jacquela applying pressure to Brown's neck. The officer radioed a description of the suspect and requested immediate assistance. Brown, who sustained a gunshot wound to his neck and another to his chest, died at the scene while the officer was attempting life-saving measures.

Several other people in the area witnessed or heard the shooting. Joshua H. lived at the same apartment complex on 47th Street as Jonathan and Jacquela. Just before the shooting, Joshua was sitting in the driver's seat of his girlfriend's car, parked near Brown's car. His girlfriend, Stephanie G., was throwing away trash in a nearby dumpster. When Joshua first saw Whitaker, he was sitting down. Whitaker then stood up and started walking toward the cul-de-sac where Brown was working. Joshua gave Whitaker a head-nod. Joshua, whose window was down, did not hear any conversation between Whitaker and Brown. Moments after he saw Whitaker walk toward Brown, Joshua heard a gunshot and then another gunshot two or three seconds later.

4

After Joshua heard the gunshots, he drove toward the dumpster and told Stephanie to get in the car. In his side mirror he saw Brown and Whitaker fighting. Joshua testified the men were "tossing each other around," and it looked like Brown was trying to get Whitaker off him and "to protect himself." Joshua saw Brown fall to the ground and Whitaker holding him down. Once Stephanie got in the car, Joshua drove away. As he drove away, Joshua passed the police car and then turned around to return to the scene.

Stephanie told a detective at the scene that she was outside of the car throwing away trash when the shots were fired. She saw Whitaker sitting down, then get up, walk between her and her car, look at Joshua, and then walk to Brown and shoot him. She then saw Brown trying to fend off Whitaker when the second shot was fired.

Antonio S. also lived at the apartment complex on 47th street. On the evening of the shooting, after returning home with a friend from the store, he backed his car into a parking spot. He saw Whitaker sitting on the wall in front of his car. Antonio went upstairs to his apartment while his friend stayed downstairs. As soon as Antonio got inside, he heard a gunshot. He went outside and heard, "Get the kids in the house. Get the kids in the house." Then Whitaker ran past and Antonio heard him say, "Fuck this shit. I can't do life."

Not long after the shooting, a neighbor saw someone, later identified as Whitaker, throwing his sweatshirt and sweatpants over his fence. The man yelled to Whitaker when he tried to climb over the fence, and Whitaker continued along the fence line.

Another neighbor, Viridiana F., saw Whitaker run past her front window and shortly after heard her front door open. She got up from the

5

couch and saw Whitaker in her house. He was sweating and did not have anything in his hands. Viridiana escorted him out of her house through the backdoor. Once he was out of the house, she locked her doors and called 911. When the police arrived, they found Whitaker in Viridiana's backyard and took him into custody. Once in custody, the police brought Jonathan and Jacquela to Whitaker and they both identified him as the shooter.

After Whitaker was taken to jail and was waiting to get his photo taken, he spontaneously stated, "I grabbed it, I pushed the button. I dropped the motherfucker." Then he paused, looked at the officer who was with him, and repeated, "I dropped the motherfucker."

The medical examiner who performed the autopsy on Brown's body testified that one bullet perforated the skin and muscle on the right side of Brown's neck; transected the internal jugular vein on the right side; entered the chest cavity at the top of the right chest, fracturing the right first rib; perforated the right lung; exited the chest cavity, fracturing the posterior right fifth rib; perforated the muscle of the back; and exited the skin of the back. A second bullet struck Brown's chest; perforated the skin and right pectoralis muscle; entered the chest cavity, fracturing the anterior right third rib; perforated the right lung; exited the chest cavity, fracturing the posterior right eighth rib; perforated the muscle of the back; and exited the skin of the back.

According to the examiner, both bullets traveled backward, downward, and rightward through the body. The exit wound for the bullet that entered the neck was 3.5 inches lower than the entrance wound, while the exit wound for the bullet to the chest was 1.25 inches lower than the entrance wound. The medical examiner could not determine whether the shot to the neck or the shot to the chest occurred first. A neck gator that was removed from

Brown's body had multiple defects that aligned with the gunshot entry wound on his neck. The defects had some gray-black discoloration consistent with soot, and there was possible searing along the edges of the larger defect. There was also black discoloration in the folds of Brown's neck and along the side of his neck that was consistent with soot. A circular defect on Brown's T-shirt corresponded to the gunshot entrance wound on Brown's right chest. The medical examiner did not see any soot or stippling on the T-shirt or Brown's chest. The examiner testified that for soot to be deposited on the neck and gator, the firearm was likely fired at close range—within several inches—and that searing generally occurs within contact range.

Investigators recovered a pocketknife that was clipped to Brown's belt, which was looped through his pants waistband. The knife was in the closed position. At the scene of the shooting, investigators found the firearm used by Whitaker and two 9-millimeter casings. On top of Brown's car, there was brake fluid and another automotive fluid. Underneath the car's hood, there was a funnel. There was a bullet mark on the hood that indicated the bullet was travelling in a southbound direction from where Whitaker and Brown were seen toward Brown's car. There was a hat and blood on the hood of the Toyota Camry near where the men were seen fighting.

Investigators also reviewed Whitaker's Facebook account, which contained messages between Whitaker and another person about the purchase of a gun. On January 23, 2021, the person sent Whitaker a photo of a 40-caliber Glock 27 that he was selling for $800 and the next day Whitaker responded he would pick it up. The gun in the photo matched the firearm found at the scene of the shooting. A criminalist for the San Diego Police Department's crime lab testified that the weapon is "a homemade gun" that was "based off of a Glock 27 40-caliber subcompact pistol." She also stated

7

the gun was an un-serialized semiautomatic firearm. There were also bloodstains on the slide of the gun and muzzle, and on the magazine.

A forensic firearm and toolmark examiner test-fired the gun, using three rounds from the magazine. The examiner concluded both casings from the crime scene were fired from the same firearm and that they were fired by the seized gun. In addition, police used a gunshot residue kit on Whitaker after he was arrested because he kept ripping off the paper bags placed on his hands. Evaluation of the kit showed Whitaker had been exposed to gunshot residue.

Police also performed DNA testing on the sweatpants and sweatshirt recovered from the backyard of the neighbor who saw a person throw the clothing, on the T-shirt and shorts Whitaker was wearing at the time of his arrest, and on the firearm. The testing showed that both Brown and Whitaker were contributors to DNA found on all of the items.

In addition, police obtained video from the security system of the nearby trolley station and a trolley that was passing. The video showed Whitaker walking toward the cul-de-sac where Brown worked on his car; the view of Brown and the front of his car is blocked by a pole and tree branches. Whitaker walks toward the car in a zig-zag pattern. Seconds later, right before the trolley goes by and blocks the camera's view, Whitaker is behind the blue Toyota Camry, when Brown steps backward to the passenger side of his car.

About the same time, the forward-facing camera on the trolley captures Whitaker stepping out from behind Brown's car and approaching Brown, who is at the side of his car. Within a second, the first gunshot goes off. Then Brown rushes toward Whitaker, and the men disappear from view behind another car, and a second shot can be heard. Less than a second later, the

men appear on the passenger side of the car and seem to be struggling with each other. The men move toward the rear of the car and then fall to the ground. Tenths of a second later, Jonathan and Jacquela run toward the men.

Whitaker is then seen standing over Brown, who is on the ground. Tenths of a second after that, Whitaker runs away from the shooting scene toward the trolley platform.

B. *Defense Case*

Whitaker's defense consisted of four components: Character witnesses who testified about Brown and Whitaker; the testimony of a forensic toxicologist who opined on substances discovered in Brown's system after his death; an expert in injury biomechanics, who opined that Brown was leaning over Whitaker when Brown was shot; and Whitaker's testimony, which occurred after the court denied his request for jury instructions on voluntary manslaughter based on imperfect self-defense and provocation.

Whitaker's first character witness was a police officer, who testified that in 2017 he was called out to Funky Garcia's bar to help close it down because it was over capacity. The officer stated Brown was working security at the front door, and he asked Brown if he was carrying a weapon. Brown agreed to let the officer search him and he told the officer that he was carrying brass knuckles. As a result, the officer arrested Brown.

Whitaker's mother and twin brother testified that Whitaker was a peaceful person and that they had never seen him act out in a violent way, even when drinking. Whitaker's mother described him as a compassionate person with a gentle soul. His twin brother described him as a happy, goofy person who liked to make people laugh. His mother knew Whitaker kept a knife for protection, but testified he did not use the knife or threaten anyone

9

with it.  Finally, a chef who supervised Whitaker when he worked as a restaurant cook in 2019 testified that Whitaker was lighthearted, always laughing and smiling, and calm.  He also stated he did not view Whitaker as violent.

Whitaker's forensic toxicology expert, Kristen Steward, testified that the report from Brown's autopsy showed the presence of amphetamines and cannabinoids in his blood system.  The test results also indicated Brown had active THC in his system at the time of his death.  Steward testified, however, that after death, postmortem redistribution can occur that at least one study has shown increases the level of methamphetamine roughly by double.  She conceded that it is not possible to look at a concentration of methamphetamine or THC in a postmortem sample and determine what the level was at the time of death.

Steward further testified that when methamphetamine is active in the system, it is a central nervous system stimulant.  An individual under the influence of methamphetamine may experience an elevated pulse, disordered or confused thinking, and rapid or incoherent speech.  She stated someone under the influence of methamphetamine may experience paranoia, hallucinations, or delusions, and that violence can be associated with methamphetamine use.  Steward stated marijuana can act as a central nervous system stimulant and a depressant, and that it can also act as a hallucinogen, causing paranoia or delusions.  Steward testified that if someone is under the influence of two different substances, the drugs can cause confused thinking, elevated pulse, and dilated pupils.

Steward also testified that she performed toxicology testing on Whitaker's urine sample, and that the results showed the presence of Carboxy Delta-9 THC, which meant Whitaker was metabolizing marijuana

that he previously used. Cocaine and a metabolite of cocaine were also present in Whitaker's sample at levels indicating that he had not used cocaine for a day or so.

Whitaker's expert in injury biomechanics, Dutch Johnson, Ph.D., testified that he used Brown's injuries and measurements of the entry and exit wounds to imagine Brown's body relative to a trajectory of the bullets from the handgun. His measurements were based in part on a slope evaluation, and the measurements were provided by the defense investigator. To form his conclusions, Johnson assumed the handgun was held upright in front of Whitaker in a "typical offhand shooting position" with one hand. Based on the measurements, Johnson concluded Brown was either leaning forward, squatting down, or a combination of both when he was shot in the chest. According to Johnson, at the time Brown was shot, the minimum distance between him and Whitaker was three-and-a-half feet and the maximum distance was eight feet. Johnson also believed Brown was rotated 40 degrees clockwise, as opposed to standing face-to-face with Whitaker.

Johnson concluded Brown was leaning forward or squatting down or a combination of both when he was shot in the neck, Brown was rotated 30 degrees clockwise, and Brown and Whitaker were about three-and-a-half feet apart. In Johnson's opinion, the first shot was to the chest, and the second shot was to the neck after Whitaker and Brown were closer together. This opinion was supported by the fact that Brown was bent further forward at this point because of a spinal reflex reaction, which occurs when a person is injured and involuntarily tries to protect that injury by pulling away, bringing hands up to the injury, and bending. In addition, Johnson testified his conclusion was supported by the soot on Brown's neck and the video evidence showing physical contact between the men after the first shot.

11

When he took the stand, Whitaker testified he lost his job during COVID, and that around the time of the shooting, he would just walk his dog and drink alcohol because he had nothing else to do. Sometimes he used cocaine and marijuana. The morning of the shooting, Whitaker worked out with his twin brother, then went home. Later that day, he consumed a pint or so of vodka at home. Whitaker then left home with the gun used in the shooting and went to a bar, Little Miss Brewing, where he drank several beers. He then took the trolley to the Euclid stop to get some food at a taco shop.

Before he got to the taco shop, Whitaker stopped at a liquor store and bought some cognac. Whitaker then bought rolled tacos and a Sprite at the taco shop. Afterwards, he headed back to the Euclid trolley station, eating as he walked. Throughout the day, he carried the gun in the waistband of his sweatpants. The gun did not have any safety device and was loaded. Whitaker testified he bought the gun from someone on Facebook in January or February 2021. After he ate, Whitaker said he planned to take the trolley back home. By the time he made it back to the Euclid trolley station, he had drunk more than half of the bottle of cognac. He got on the trolley and felt buzzed. He got off at the 47th Street stop because he needed to urinate. After he did so, Whitaker sat on the wall where Brown and Jonathan first saw him and smoked a cigarette.

Whitaker testified he had never met Brown, Jonathan, or Jacquela before. He saw Jonathan's car pull up and back into the parking spot; one person got out and went upstairs, and the other walked toward the car in the cul-de-sac. Neither Brown nor Jonathan said anything to him. Within five minutes, Whitaker walked up to Brown, who was at the hood of his car, to ask for another cigarette. Whitaker said when he was about six feet from

12

Brown, he stopped, and reached into his pocket for the bottle of cognac. According to Whitaker, Brown then turned around, looked at Whitaker, and rushed him. Whitaker said he was scared, pulled the gun out of his waistband, and shot Brown. Whitaker explained that he was scared because of Brown's size and said that his decision to shoot Brown was made in a split-second.

Whitaker testified that after the first shot was fired, Brown grabbed him by the shoulders, gripped his sweater with one hand, and grabbed the gun with his other hand, pulling Whitaker toward Brown. Then the gun fired a second time; Whitaker said he did not pull the trigger on purpose. Whitaker said he was not sure whether he or Brown had been shot. Whitaker testified that as they struggled over the gun, the gun left his hands, and that he tried to get away. Whitaker also stated that Brown initially had leverage over him, but then became weak. As this happened, Jonathan and Jacquela ran over, and Jacquela kicked Whitaker in the neck, which separated him from Brown. When Whitaker heard Jonathan ask where the gun was, Whitaker broke loose and ran away from the scene. Whitaker stated he did not see the approaching police car as he ran.

According to Whitaker, he took his clothes off because he was checking for his injuries. He said he was "kinda going in and out," and only remembered some of his interactions with the police. During his initial interview with the police, Whitaker said he was jumped and did not remember what happened before that.

On cross-examination, Whitaker stated that he had been walking around with a gun since March. Sometimes the gun was loaded and sometimes it was not, and he did not know why a round was in the chamber that day. Whitaker also testified that he did not know Brown was an MMA

fighter, whether he had used methamphetamine recently, or that he had a knife on his belt. Whitaker agreed that as far as he knew, Brown was unarmed and was minding his own business. He also conceded it was possible he perceived a threat where none existed because he was intoxicated.

C. *Rebuttal Evidence*

After Brown's testimony, the prosecution offered into evidence footage from a body-worn camera of one of the police officers who arrived shortly after the shooting. In the video, another officer tells Whitaker he has been identified as a suspect for an ongoing crime. Whitaker then asks if he hurt someone and "Is it a black person?" Whitaker then goes on to say, "I wanna hurt a white person but Mexicans and Asians and Black people . . . ." Later, Whitaker states, "It is making me feel like I really did what I fuck I've been dreaming about for a fucking a long fucking time. And I mean, fucking[-A] I need a psychiatrist."

The prosecution also played a redacted video of Whitaker's interview by detectives in the early morning hours the day after the shooting. At first, Whitaker stated he did not remember how he got to the 47th Street trolley stop area and only remembered someone being on top of him, somebody running up and kicking him, and then getting up and running away. Later, Whitaker added he saw a man and woman go up the stairs, and he came up to the man and woman and asked for a cigarette. He expressed surprise that someone had been killed and said, "I protected myself, but I know I ain't killed nobody." Whitaker also stated he initially thought he was the one who had been shot. Whitaker repeatedly denied carrying a gun. Later, he told the officers he recalled seeing a gun that looked like a Glock on the ground, but he did not know where it came from. He insisted the gun was not his and that he did not use the gun.

D. *Verdict & Sentencing*

The jury found Whitaker guilty of second degree murder and found true the firearm enhancement allegation under Penal Code section 12022.53, subdivision (d).[2] The jury also found Whitaker guilty of a second charge, possession of a weapon in a penal institution in violation of section 4502, subdivision (a).[3] Thereafter, the court sentenced Whitaker to 15 years to life for the murder conviction, plus 10 years for the firearm enhancement, and a consecutive sentence of three years for the possession conviction. Whitaker filed a timely notice of appeal.

DISCUSSION

I

Whitaker first asserts the trial court erred by refusing to give jury instructions on voluntary manslaughter based on imperfect self-defense and provocation. He further argues the court's refusal to give the instructions compelled him to testify in violation of his Fifth Amendment rights. The Attorney General responds the court correctly concluded there was insufficient evidence to support the requested instructions. Further, he contends that even if there was error, there was no prejudice, evidenced by the fact that the instructions *were* given and the jury convicted Whitaker of second degree murder. In addition, the Attorney General asserts Whitaker was not compelled to testify by the court's decision not to give the requested instructions. Rather, Whitaker was free not to take the stand and challenge

---

[2] Subsequent undesignated statutory references are to the Penal Code.

[3] The prosecutor presented evidence during the trial that a five-inch wooden shank was found in Whitaker's clothing during a strip search while he was in custody. Whitaker does not challenge this conviction on appeal.

15

the alleged instructional error on appeal.  As we shall explain, we agree with the Attorney General that there was no instructional error.

A

*Additional Background*

In his trial brief, Whitaker moved to admit all evidence related to self-defense.  After Whitaker presented his first witness, his counsel asked the court to address voluntary manslaughter based on imperfect self-defense.  The court responded that after the defense presented its case, it would discuss the imperfect self-defense instruction.  The prosecution then filed a supplemental "Brief re: CALCRIM 571 Imperfect Self Defense."  Therein, the prosecutor asserted there was insufficient evidence to support an instruction on imperfect self-defense because there was no evidence that Whitaker harbored an actual belief that he needed to ward off an imminent attack that would cause him great bodily injury or death.

At a break in the proceedings during Johnson's testimony, the court informed Whitaker of his rights both to testify or not, asked Whitaker if he understood his rights and if he had sufficient time to speak with his counsel about his decision, and confirmed Whitaker had decided not to testify.  After the defense rested its case, the court asked Whitaker's counsel if he had reviewed the prosecution's brief on imperfect self-defense.  Counsel indicated he had not reviewed the brief, but was prepared to address the issue.  He argued Whitaker's fear was shown by the video from the trolley station, which he asserted suggested Brown charged Whitaker, the testimony of the woman whose house Whitaker entered after the shooting that Whitaker

16

seemed scared,[4] and Johnson's testimony concerning the positioning of Brown and Whitaker. Whitaker's counsel also argued the totality of the circumstances suggested Whitaker was afraid of Brown.

In response, the prosecutor asserted there was not sufficient evidence to support an instruction on imperfect self-defense. The prosecutor pointed out there was no witness testimony that showed Whitaker thought Brown was going to kill him, and that Johnson never testified, as defense counsel had asserted, that Brown was in a "charging position." Later in the proceedings, the prosecutor questioned whether the defense would seek a heat of passion jury instruction based on Johnson's testimony that Brown was crouched or lunging at the time of first gunshot. Defense counsel stated he would look at the issue.

The next day, the parties argued whether imperfect self-defense and provocation instructions were supported by the evidence. Whitaker's defense counsel asserted there was as much circumstantial evidence to support the theory that Whitaker unreasonably believed his life was in jeopardy as there was to support the prosecution's theory that he killed Brown with malice. When the trial court suggested the video showed shots were fired before Whitaker and Brown began to struggle with each other, Whitaker's counsel argued that an equally reasonable interpretation of the video evidence was that Brown charged Whitaker and then he fired the gun. Defense counsel also argued there was circumstantial evidence that Brown charged Whitaker, which supported a heat of passion instruction. Counsel pointed to the fact

---

4     Her actual testimony, however, was not that Whitaker was scared. Rather she stated he acted nervous and was sweating, and that he was reluctant to go outside because of the police helicopter flying overhead.

17

that Whitaker weighed 140 pounds, while Brown was a 240 pound "cage fighter."

The prosecutor responded that in the cases cited by the defense, there were explicit statements by the defendants that they were in fear. She also argued that contrary to the defense's assertion, there was no evidence that Brown lunged at Whitaker. After additional argument, the court issued its ruling from the bench, denying Whitaker's request for jury instructions on imperfect self-defense and provocation on the grounds that there was not sufficient evidence to support the instructions. The court also stated that it would permit the defense to reopen its case to allow Whitaker to testify and would also allow the prosecution to present rebuttal witnesses if necessary. Whitaker's counsel stated immediately that Whitaker would testify.

After the conclusion of evidence, including Whitaker's testimony and the prosecution's rebuttal evidence, the court instructed the jury with CALCRIM Nos. 570 ("Voluntary Manslaughter: Heat of Passion"), 571 ("Voluntary Manslaughter: Imperfect Self-Defense"), and 522 ("Provocation: Effect on Degree of Murder").

B

*Legal Standards*

"An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death. [Citation.] Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself. [Citation.] It is well established that imperfect self-defense is not an affirmative defense. (See *People v. Barton* (1995) 12 Cal.4th 186, 199–201 (*Barton*).) It is instead a

18

shorthand way of describing one form of voluntary manslaughter." (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).)

"And voluntary manslaughter, whether it arises from unreasonable self-defense or from a killing during a sudden quarrel or heat of passion, is...more precisely,...a lesser offense included in the crime of murder. Accordingly, when a defendant is charged with murder the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense."[5] (*Barton, supra*, 12 Cal.4th at pp. 200–201.)

"Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. (*People v. Manriquez* (2005) 37 Cal.4th 547, 587–588, (*Manriquez*); see also *Barton, supra*, 12 Cal.4th at p. 201, fn. 8, ['Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive'].) Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense. ([Citation]; see also *Barton*, at p. 201 ['the need to [instruct sua sponte on imperfect self-defense] arises only when there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is "minimal and insubstantial" ' (fn. omitted)].)" (*Simon, supra*, 1 Cal.5th at p. 132; *People v.*

---

[5]    "In contrast to lesser included offenses, a trial court's duty to instruct, sua sponte, or on its own initiative, on particular defenses is more limited, arising 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*Barton, supra*, 12 Cal.4th at p. 195.)

19

*Ceja* (1994) 26 Cal.App.4th 78, 85 (*Ceja*) ["Substantial evidence is evidence from which a reasonable jury could have concluded ' "that the particular facts underlying the instruction did exist." ' "].)

"We review de novo a trial court's decision not to give an imperfect self-defense [or provocation] instruction. (See *Manriquez, supra*, 37 Cal.4th at p. 581; see also ([*People v.* ]*Waidla* (2000) 22 Cal.4th [690,] 733 ['An appellate court applies the independent or de novo standard of review to the failure by a trial court to instruct on an uncharged offense that was assertedly lesser than, and included, in a charged offense.'].)" (*Simon, supra*, 1 Cal.5th at p. 133.)

C

*Analysis*

As discussed, Whitaker contends the court erred by denying his request for instructions on imperfect self-defense and provocation after he initially rested his case because there was sufficient evidence at that time to support the instructions. Specifically, Whitaker points to Joshua's testimony that "Whitaker was just sitting down minding his own business," "Whitaker approached Brown and only moments later [Joshua] heard two gunshots," and when Joshua "looked towards the men, he saw they were fighting and 'tossing each other around.' " Whitaker also relies on Johnson's testimony that "Brown was leaning forward or squatting down in a forward angle when he was first shot in the chest," and that "Brown had moved closer to Whitaker before being shot a second time." He contends this evidence "showed that prior to the shooting there was an altercation and the shooting was responsive to this altercation. Whitaker further asserts it was non-

sensical for the court to instruct the jury on self-defense, but not on imperfect self-defense.

The flaw in Whitaker's argument is that the evidence he cites does not show there was any altercation before the shots were fired.  Rather, the evidence before the court prior to Whitaker's testimony suggested only that an altercation between the men ensued after at least one shot was fired.  As the Attorney General asserts, an imperfect self-defense instruction " 'requires without exception [evidence] that the defendant must have had an *actual* belief in the need for self-defense.' "  (*Manriquez, supra*, 37 Cal.4th at p. 581.)  Likewise, the court must instruct on heat of passion only when there is evidence of provocation.  (See *People v. Landry* (2016) 2 Cal.5th 52, 97 [heat of passion sufficient to reduce murder to manslaughter " 'exists only where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " ' "].)

Contrary to Whitaker's description of the evidence, no evidence showed Brown lunged or even moved toward Whitaker prior to the gunshots.  Rather, Joshua saw the men engaged in a physical altercation only *after* he heard the gunshots.  Joshua did not testify, as Whitaker states, that he thought Whitaker was minding his own business.  Rather, Joshua testified that he was minding his own business when he saw Whitaker sitting on a wall near where Joshua was parked.

Johnson's testimony also did not support instructions on imperfect self-defense or provocation.  Rather, Johnson only speculated that Brown could have been leaning forward or squatting when the first shot struck Brown in the chest.  This testimony does not, as Whitaker asserts, show he was in fear

21

or that he was provoked. Indeed, it provides no insight into Whitaker's mental state before he fired the gun.[6]

The evidence that was presented suggested only that Whitaker fired the first shot without any provocation or fear. Although Jonathan testified he heard Whitaker say he was shot, the statement was made after both shots were fired and it is undisputed Brown did not have a gun. This statement did not suggest that Brown was the initial aggressor in the encounter. Further, once in custody, Whitaker twice stated, "I dropped the motherfucker." As the Attorney General states, absent Whitaker's own testimony, "the record was devoid of evidence that Brown was the aggressor or that [Whitaker] believed Brown posed an imminent threat of death or great bodily injury." We agree with the Attorney General that the trial court did not err in refusing to instruct the jury on voluntary manslaughter.

---

[6] Whitaker also asserts that because the court instructed on self-defense, it was also required to instruct on imperfect self-defense. We disagree. Unlike the affirmative defense of self-defense, which requires the court to instruct when the defendant makes clear he is presenting this affirmative defense, an instruction on the lesser included offense of voluntary manslaughter based on imperfect self-defense must be given only if there is evidence before the jury to support the instruction. In support of his argument, Whitaker points to a concurring opinion in *Ceja, supra*, 26 Cal.App.4th 78. The concurrence in *Ceja*, however, is entirely dicta. In that case, the defendant testified that in an encounter he initiated with rival gang members he feared for his life and shot in self-defense. (*Id*. at p. 84.) The trial court instructed the jury on self-defense, but not imperfect self-defense. (*Id*. at p. 85.) The defendant challenged that ruling on appeal and the court reversed, concluding there was sufficient evidence to support the instruction. (*Id*. at p. 86.) In the concurring opinion, cited by Whitaker, Justice Johnson expressed his view that an imperfect self-defense instruction should be given in every case where a self-defense instruction is provided. (*Id*. at pp. 89–91.) This view has not been adopted in California and Whitaker provides no argument as to why it should be adopted here.

22

Because we conclude the trial court did not err by refusing to instruct the jury on imperfect self-defense and provocation after the defense initially rested its case, we need not reach Whitaker's claim that this error caused him to take the stand in violation of his Fifth Amendment right against self-incrimination. We do note however, that even if we were to find instructional error, we would conclude that Whitaker was not compelled to take the stand in violation of his constitutional rights.

As the Attorney General points out, "there is no compulsion in such a case, since the defendant has the option of refusing to testify and instead, if he is convicted, of obtaining appellate correction of the erroneous evidentiary ruling and with it a new trial." (*United States v. Paladino* (7th Cir. 2005) 401 F.3d 471, 476.) While this rule "puts the defendant to a hard tactical choice," "the alternative would be to give him two bites at the apple: testify, and try to win an acquittal; if that fails, appeal and get a new trial on the basis of the judge's ruling." (*Ibid.*; see also *United States v. Caira* (7th Cir. 2013) 737 F.3d 455, 460–461 [following *Paladino* and rejecting the defendant's argument that the trial court's evidentiary error had the effect of forcing him to take the stand].)

Here, Whitaker was not compelled to testify as a result of the trial court's ruling. Rather, he was free to not testify and then, if convicted of murder, appeal on the basis of the instructional error. Instead, Whitaker voluntarily chose to take the stand. Before he testified, the trial court reminded appellant that he had the right to remain silent and did not need to testify. Defense counsel responded that the defense would like to reopen the case so that Whitaker could testify, and Whitaker voiced no objection.

Whitaker also asserts the court failed to obtain an express waiver of his Fifth Amendment right to remain silent before reopening his case. But no

express waiver was required. With respect to certain fundamental matters, such as whether to plead guilty and whether to waive the right to trial by jury, criminal defendants must be admonished and the court must secure an express waiver. (*In re Horton* (1991) 54 Cal.3d 82, 95 (*Horton*).) However, for the waiver of "other fundamental rights of a less personal nature, courts may assume that counsel's waiver reflects the defendant's consent in the absence of an express conflict." (*Ibid*.)

"When the decision is whether to testify [citation]...it is only in case of an express conflict arising between the defendant and counsel that the defendant's desire must prevail. In the latter situation, there is no duty to admonish and secure an on the record waiver unless the conflict comes to the court's attention. [Citation.]" (*Horton, supra*, 54 Cal.3d at p. 95; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1332–1333.) No conflict between Whitaker and his counsel regarding whether he should testify was brought to the trial court's attention. Accordingly, the trial court was not obligated to obtain an express waiver from Whitaker of his right to remain silent.

## II

Whitaker next contends that the court erred by denying his request for a proposed pinpoint jury instruction, which stated: "It is not the character of the weapon used that determines the degree of the offense, but . . . the presence or absence of deliberation and malice that makes the crime manslaughter or murder." The Attorney General responds that the instruction was unnecessary because it was explained in other instructions and asserts the instruction was argumentative.

At the end of the prosecution's case, Whitaker's counsel requested the pinpoint instruction, which was based on language in *People v. Crowey* (1880) 56 Cal. 36. Counsel requested this instruction based on his concern that the

24

gun was not registered, explaining the instruction was relevant because "the unregistered nature of the handgun alone does not automatically create malice…." The prosecutor opposed the instruction on the ground it unduly emphasized a particular area of the defense's argument, but pointed out that Whitaker's counsel was free to make the argument in closing. The court agreed with the prosecutor there was no need for the instruction: "[W]e really haven't made that much of a deal over unregistration or ghost gun or anything like that, so I don't know that it needs to be highlighted. So it will not be given."

A criminal defendant is entitled, upon request, to a nonargumentative instruction that pinpoints his or her theory of the case. (*People v. Ledesma* (2006) 39 Cal.4th 641, 720.) The court may, however, refuse such instructions where they are incorrect statements of the law, argumentative, duplicative, potentially confusing, or not supported by substantial evidence. (*People v. Moon* (2005) 37 Cal.4th 1, 30.) Argumentative instructions " 'select[ ] certain material facts, or those which are deemed to be material, and endeavor[ ] to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions containing a correct principle of law.' " (*People v. Wright* (1988) 45 Cal.3d 1126, 1135.) We review the refusal to give a pinpoint instruction de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In determining whether the court properly instructed the jury, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Additionally, the Supreme Court has cautioned courts to carefully review proposed jury instructions based directly on language in appellate

opinions. "Language in an appellate court opinion which may be a good statement of law or of the reasoning of the appellate court does not necessarily make a good jury instruction." (*People v. Adams* (1987) 196 Cal.App.3d 201, 204–205.) The appellate courts, in discussing legal principles for one purpose, may not have contemplated their language being used as a jury instruction. (*People v. Hunter* (2011) 202 Cal.App.4th 261, 277–278; *People v. Knoller* (2007) 41 Cal.4th 139, 154–155.)

In *Crowey*, the trial court modified the manslaughter instructions to convey that if one party kills another in the heat of passion, and without malice, "the crime cannot be manslaughter *if a dangerous weapon is used*." (*Crowey, supra*, 56 Cal. at p. 41.) The Supreme Court concluded the modified instructions misstated the law: "Whether the killing is murder or manslaughter, does not depend upon the fact whether or not a dangerous weapon was used; and to make the character of the crime depend, not upon the intention with which the act was done, but upon the character of the instrument by means of which the death-blow was inflicted, is not, in our opinion, justified by any legal principle." (*Ibid*.) Here, the given jury instructions did not suggest the character of the weapon used determined the degree of murder or the existence of malice. Accordingly, there was no need to instruct the jury otherwise, and the trial court properly declined to give the proposed pinpoint instruction.

DISPOSITION

The judgment of conviction is affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

RUBIN, J.