Filed 8/6/25  P. v. Goehner CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL LESLIE GOEHNER,<br><br>    Defendant and Appellant. | D085454<br><br><br>(Super. Ct. No. INF2101305) |

APPEAL from a judgment of the Superior Court of Riverside County, Bernard Schwartz, Judge.  Affirmed.

Rachel Varnell, under the appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Michael Leslie Goehner was arrested and charged with first degree murder in connection with the killing of A. Martinez at the trailer park where Martinez lived. Following his arrest, Goehner was placed in a holding cell where law enforcement agents posing as inmates had been planted to try to elicit information from him about the killing. As part of their discussion, the agents advised Goehner to waive his right to an attorney during his forthcoming custodial interview and claim self-defense. Although Goehner did not make any incriminating statements to the agents, he ultimately followed their advice by telling investigators that he fired in self-defense at Martinez, who was armed with a gun, and two other persons who tried to mug him.

Jurors heard three theories for what happened on the night Martinez was killed. The People maintained that Goehner shot an unarmed Martinez while he was standing with two other unarmed people in front of a neighbor's trailer. Goehner's counsel suggested that someone else was the shooter. Jurors also heard the self-defense story Goehner told investigators. The jury apparently credited the People's version of the crime, as Goehner was convicted of second degree murder and several firearm offenses.

On appeal, Goehner raises two issues regarding his murder conviction. Over his objection, the trial court admitted the recordings of the undercover operation and Goehner's custodial interview. He argues that this was a due process violation because his claim of self-defense during his custodial interview, which concededly placed him at the scene of the killing, was coerced by the agents during the undercover operation. We conclude on our own review of the record that there was no coercion and the trial court properly admitted Goehner's statements.

The second issue concerns the court's decision to deny Goehner's request for a jury instruction on imperfect self-defense. He contends that the jury could have convicted him for manslaughter in lieu of murder under this theory even if the jurors believed the People's version of the events. Right before Martinez was shot, one of the neighbors to whom he was talking yelled, "[Q]uit shooting!" In Goehner's view, the jury could have found that this exclamation caused him to unreasonably believe that the unarmed group represented a threat of imminent harm necessitating the use of deadly force, which are the elements of imperfect self-defense. To the contrary, however, we agree with the trial court that this exclamation, by itself, was not sufficient to warrant the jury instruction.

Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2021, Martinez was shot and killed at the trailer park in Desert Hot Springs where he lived. Witness testimony and video evidence placed Martinez standing outside Blanca Galvan's mobile home with Galvan and one other person at the time of the shooting. Moments earlier, gunfire was heard coming from the southwest corner of the trailer park. A person wearing all black with a black beanie and black facemask was seen running north through the trailer park from that area. As the individual ran by Galvan's trailer, she told him, "[Q]uit shooting!" The individual immediately fired in her direction, killing Martinez. The shooter then ran to the north end of the trailer park and climbed into a car that sped away.

Law enforcement identified Goehner as a suspect after finding his DNA on two of the fifteen shell casings recovered from the trailer park. In addition, the police determined that his phone was located at the trailer

3

park when the shooting occurred. Detectives also learned that Goehner owned the car the shooter climbed into.

Goehner was arrested in August 2021 and immediately placed in a holding cell with four law enforcement agents (agents) posing as fellow inmates as part of a *Perkins* operation.[1] Goehner told the agents several times that he had not committed the murder, although he suggested that he was at the trailer park when it occurred. Under the guise of wanting to help Goehner come up with a believable story, the agents advised him to forgo requesting an attorney during the forthcoming custodial interrogation and claim self-defense.

The operation was interrupted when Detective Kupka and Sergeant Saucier (collectively, investigators) removed Goehner to another room to interview him. After waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, Goehner said that he shot Martinez in self-defense. He stated that on the night of the shooting, he had driven by himself to visit his cousin who lived across the street from the southern side of the trailer park. According to Goehner, after he got out of his car, he was surrounded by three muggers, including one who was brandishing a gun and who Goehner was "99 [percent]" sure was Martinez. Goehner said that he "took a few steps back and . . . pulled out [his] gun and . . . started shooting." After he escaped, Goehner told the investigators that he went back to his car and drove north out of the trailer park.

---

[1] This term derives its name from *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*). This type of operation typically involves placing a suspect in a cell with either law enforcement agents undercover as inmates or inmates who are police informants. The goal of the operation is for the suspect to let his or her guard down and provide the agents or informants with truthful information that he or she may not disclose during a custodial interview.

Although the investigators believed some of what Goehner told them, they were not persuaded he was being totally truthful. They told him there was a video of Martinez being shot in front of Galvan's trailer, and therefore, he could not have been involved in the attempted robbery Goehner described. The investigators suspected that Goehner fired in the group's direction in response to something Martinez said to him. Goehner did not address this suspicion, nor did he have answers for other inconsistencies the investigators identified between the evidence and his version of the events. He instead stuck with his self-defense story.

The People charged Goehner with first degree murder. (Pen. Code, §§ 187, subd. (a) and 189, subd. (a).) A jury convicted him of the lesser included offense of second degree murder. The evidence at trial included the recordings of the *Perkins* operation and Goehner's custodial interview; there were no defense witnesses. After finding three aggravating factors to be true, the court sentenced Goehner to 40 years to life for his murder conviction.[2]

## DISCUSSION

### A.   *The Coercion Claim*

#### 1.   *Additional Background*

Just after Goehner was placed in the holding cell, he disclosed to the undercover agents that he was facing a charge for a murder he did not commit. He also mentioned that investigators were planning to speak with him shortly. At that point, Goehner asked them, "I shouldn't talk to them, should I, without a lawyer?" They advised him to hear what the investigators

---

[2]   Goehner was also convicted of several firearms-related offenses that are not at issue in this appeal. His total sentence for those convictions was a determinate term of eight years and eight months to be served consecutively with the indeterminate term of his murder conviction.

5

had to say, to which Goehner responded, "That's what I was thinking, hear—hear what they have to say."

The main topics of conversation during the operation were whether Goehner should talk to a lawyer first and, if he did not, what he should tell the investigators. Goehner was especially interested in the agents' thoughts as to whether he could persuade the investigators to advise the district attorney to initially seek a lesser charge than murder. He repeatedly asked for their advice on these subjects. And when the conversation would drift off-topic, either Goehner or the agents would bring it back to his strategy for talking to the investigators.

For their part, the agents consistently discouraged Goehner from asking to speak with an attorney, telling him that if he did, a murder charge would surely be filed and he would not get another opportunity to talk to the investigators. The agents also stated that if Goehner could explain his involvement by incorporating some elements of the truth, not only might he be charged with a lesser offense, but he might also avoid jail time altogether. They also suggested that a claim of self-defense could satisfy investigators that a murder charge was not appropriate because it would give Goehner the freedom to describe the confrontation in a way that best suited his interests.

At the beginning of the operation, Goehner claimed to know little about the charge he was facing. Detective Kupka interrupted the operation after about 40 minutes to drop off paperwork to Goehner that included a picture of Martinez and three documents putting Goehner at the scene of the crime: (1) a report showing that his DNA was found but omitting on what, which was a preliminary report that had been doctored to indicate that the DNA hit was conclusive; (2) a report showing that his cell phone was at the scene during the shooting; and (3) a photo showing his car at the trailer park.

6

Another 40 minutes after that, Detective Kupka interrupted the operation again to take a cheek swab from Goehner, which he said would be used to confirm that it was Goehner's DNA on shell casings found at the scene. After taking the swab, Detective Kupka left Goehner in the holding cell.

After being handed the paperwork placing him at the scene, Goehner asked the agents again whether he should talk to the investigators. Everyone agreed that the DNA and phone reports precluded him from telling investigators that he was not there when Martinez was killed. A few moments later, Goehner and the agents engaged in a back and forth that is representative of the exchanges with which he now takes issue. Goehner spontaneously said, "I did not do this. Legit fool. I did not do this." One of the agents responded, "Alright. I'm already done talking to you man. . . . [¶] I already tried— [chuckles] I already done trying to help you dog, you're not listening homie." Goehner replied, "Well, I mean, what—what would you say if this was you right here?" The same agent then reiterated that claiming self-defense was Goehner's best strategy for avoiding a murder charge.

Although the agents may have planted the seed for Goehner to claim self-defense, they did not feed him a story. Goehner proposed telling the investigators that his car had been stolen with his phone in it, and he questioned whether the documents Detective Kupka had handed him were fake. The agents attempted to persuade Goehner that his stolen car story was not plausible and that there was no reason for the police to lie to him. After discussing the picture of Martinez that Detective Kupka handed him, Goehner blurted out, "What if—what if he tried to rob me?" The agents told him that was a "good" story, but at the same time, they warned him to be ready to have an explanation that fit with the evidence.

Again, Goehner asked: "I shouldn't run what I'm gonna tell them by a lawyer though? Before I tell them. Or I— I have no opportunity." But the agents discouraged that approach, as they had before. Although Goehner seemed to recognize that he needed his statement to line up with what the investigators already knew, he did not tell the agents any of the other details he would later provide—such as that Martinez brandished a gun, that there were two other muggers, or that he drove to the trailer park alone—despite that the agents suggested that they could help him with a story if he told them what really happened.

Just prior to being taken into the interview room, Goehner told the agents, "I'ma just tell 'em the truth. If I wasn't there, I'll tell 'em I wasn't there. If I was there, I'ma tell 'em I was there." He also thanked them for their advice.

After returning to the holding cell, Goehner disclosed that he had claimed self-defense and recounted that the investigators said Martinez was not one of the muggers. The agents responded by telling him they could have helped him with a believable story if they knew what really happened. They also suggested there was still time to talk to the investigators. But other than to imply that he might have been there when someone else shot Martinez, Goehner declined to describe what happened because he thought law enforcement might be listening.

The *Perkins* operation lasted three-and-a-half hours and was monitored by audio and video in real time. Based on our review of the transcript and video of the operation, Goehner's interactions with the agents were friendly and casual, as the agents frequently sympathized with him and his circumstance. They occasionally asked Goehner questions about the murder

8

and what he planned to tell investigators, but at no point did they threaten or attempt to physically intimidate him.

Goehner unsuccessfully moved to suppress his statements during the *Perkins* operation and his custodial interview, claiming that admitting them would violate his due process rights because the agents coerced him to claim self-defense.[3] (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199 ["The due process clauses of the federal and California constitutions bar courts from admitting involuntary confessions"].) The trial court found that Goehner "either received or sought advice on how to handle his case[]" during the *Perkins* operation and that the agents in no way coerced or compelled him to follow it. As for Goehner's post-*Miranda* statements to the investigators, the court concluded that "any compulsion that the defendant felt to speak to law enforcement, either not to invoke, or to make up a version of self-defense, arose from the defendant's own decision to follow the operatives' suggestions rather than his will being overcome by a coercive setting where law enforcement is present."

2.    *Goehner was not coerced into claiming self-defense.*

Goehner repeats his suppression argument on appeal, asserting that his post-*Miranda* statement that he shot Martinez in self-defense was the product of the agents' coercive conduct during the *Perkins* operation. Their tactics were prejudicial, he argues, because without his self-defense claim,

---

[3]    Goehner also argued that his statements made during the *Perkins* operation should be suppressed under *Miranda*, contending that the operation was a custodial interrogation. The trial court rejected this argument in a ruling Goehner does not challenge. In any case, it is well settled that agents participating in *Perkins* operations are not required to give their targets *Miranda* warnings. (*Perkins*, *supra*, 496 U.S. at pp. 295–300.)

the evidence that he was at the scene when Martinez was killed was unconvincing. The People counter that there was no coercion because the agents merely responded to Goehner's requests for advice in their perceived roles as more experienced inmates. As a result, there was no pressure on him to follow that advice. The People also dispute that any error was prejudicial by pointing to the video, phone, and DNA evidence as sufficient to support the murder conviction.

"A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346–347 (*McWhorter*).) " 'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary. . . .' " (*Id.* at p. 347.) " 'Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." ' [Citation.] The statement and the inducement must be causally linked.' " (*Ibid.*) "Police trickery" therefore, "does not, by itself, render a confession involuntary." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.)

"[T]he issue of voluntariness of a confession is reviewed independently in light of the record in its entirety." (*People v. Benson* (1990) 52 Cal.3d 754, 779.) When a defendant alleges that "coercive, deceptive, and overreaching tactics" were used by agents during a *Perkins* operation to "elicit defendant's incriminating statements," we focus whether those tactics were " 'the type

10

likely to procure an untrue statement.' "[4] (*People v. Fayed* (2020) 9 Cal.5th 147, 165 (*Fayed*).) Because Goehner's interactions with law enforcement were recorded, the facts are undisputed and we independently review their meaning and significance. (*People v. Duff* (2014) 58 Cal.4th 527, 551 [independent review of undisputed facts].)

We find no evidence of coercion. Goehner repeatedly requested the agents' advice on whether to invoke his right to counsel and, if he did not, what he should tell the investigators. He treated the agents as "jailhouse lawyers" that he could use as a sounding board to develop the best strategy to escape a murder charge. In doing so, Goehner participated in friendly discussions rather than being subjected to a pressure campaign designed to overcome his will. Indeed, his own conduct belies his coercion claim because it was apparent that he did not feel any compulsion. (*Perkins*, *supra*, 496 U.S. at p. 296 ["Coercion is determined from the perspective of the suspect"].) For example, Goehner repeatedly denied having committed a murder, was evasive when agents tried to elicit from him what really happened the night Martinez was killed, had not made up his mind about what he would tell investigators in the moments before he was interviewed, and thanked the agents multiple times for their advice.

---

[4] *Fayed*, *Perkins*, and other cases involving *Perkins* operations resolved challenges to the admissibility of incriminating statements the defendant made during the operation. (See, e.g., *Arizona v. Fulminante* (1991) 499 U.S. 279; *People v. Felix* (2024) 100 Cal.App.5th 439; *Rodriguez*, *supra*, 40 Cal.App.5th 194.) Neither party cites, nor have we been able to locate, a case addressing the circumstance where a defendant claims that coercive pressure exerted during the *Perkins* operation caused him to make incriminating statements during a subsequent custodial interview. We see no reason why this circumstance calls for a different legal analysis, and the parties do not suggest otherwise.

In short, nothing in the record suggests that the agents did anything that actually caused Goehner to waive his *Miranda* rights and claim self-defense. (*McWhorter*, *supra*, 47 Cal.4th at p. 347; see also *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 [" 'A confession is "obtained" . . . if and only if inducement and statement are linked, as it were, by "proximate" causation' "].) This is so notwithstanding that the agents took an "active" role in the operation. On this point, our Supreme Court has held that incriminating statements about a murder by the target of a *Perkins* operation were not coerced even though the undercover agent in that case asked "specific[] and arguably[] leading questions" about the murder, "appear[ed] to ingratiate himself by expressing sympathy for [the target] and commiserating" over his circumstances, and "prodded" and "coaxed" the target when he was hesitant to talk. (*Fayed*, *supra*, 9 Cal.5th at pp. 165–166.) We reach the same conclusion here. Goehner's statements during the *Perkins* operation, his post-*Miranda* self-defense story, and the incriminating admissions it encompassed were voluntarily made and therefore properly admitted.[5]

## B.     *CALCRIM No. 571*

### 1.     *Additional Background*

Goehner requested that the trial court instruct the jury on imperfect self-defense (CALCRIM No. 571) as a way in which it could convict him of manslaughter in lieu of murder. Under the theory of "perfect self-defense"—on which the jury was instructed—a defendant is exonerated of a killing if he or she actually and *reasonably* believed that deadly force was necessary to

---

[5]     Our conclusion that Goehner's post-*Miranda* statement was not coerced obviates the need to reach the parties' arguments concerning prejudice.

12

respond to a threat of imminent harm.[6] (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  However, when the defendant's belief in the need to use deadly force "subjectively exists but is objectively *unreasonable*, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter." (*Ibid.*, italics added.)

The sole evidentiary basis for Goehner's request was Galvan's "[Q]uit shooting!" exclamation.  He argued it was plausible that the jury would believe he heard Galvan's command as he was fleeing from three muggers (not to include Martinez under this theory).  From there, he surmised the jurors could infer he believed that Martinez, Galvan, and the person talking to Martinez were somehow associated with the muggers. The theory then went that Goehner subjectively believed Galvan's statement placed him in imminent danger to which he needed to respond with deadly force.  But he posited that because no one in Martinez's group was brandishing a gun, the jury could conclude Goehner's beliefs were unreasonable.

After the court noted that there was no evidence tending to show that Galvan's exclamation caused Goehner to subjectively fear for his safety, as he had not addressed that statement during either the *Perkins* operation or his custodial interview, it denied his request.

---

[6]    In the court's view, if the jury believed Goehner's post-*Miranda* statement that Martinez was an armed mugger, it could conclude he acted reasonably in believing that deadly force was needed to defend himself.

2.  *The theory of imperfect self-defense was not supported by substantial evidence.*

"A defendant charged with murder is entitled to an instruction on imperfect self-defense when there is substantial evidence to support the theory." (*People v. Schuller* (2023) 15 Cal.5th 237, 243.) "Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed." (*People v. Simon* (2016) 1 Cal.5th 98, 132.) "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*Ibid.*) We review de novo whether sufficient evidence supported the giving of an instruction of imperfect self-defense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).)

In applying this standard here, we have examined a record devoid of any evidence suggesting that Galvan's exclamation caused Goehner to subjectively believe he needed to respond with deadly force to a threat of imminent harm. As the trial court correctly observed, there was no evidence of his state of mind at the time. In the absence of such evidence, the trial court properly declined to instruct on imperfect self-defense. (See *Manriquez*, *supra*, 37 Cal.4th at p. 639 [this instruction was inappropriate where defendant made "no claim of ever having seen [the victim] armed with any weapon, said nothing about believing [the victim] was armed, and never indicated he felt he was under any imminent threat of death or great bodily injury"].)

We reach this conclusion even though the court *did* instruct the jury on perfect self-defense. Quoting the bench notes for CALCRIM No. 505 (perfect self-defense), Goehner suggests that the trial court erred because " '[i]f there is substantial evidence of a defendant's belief in the need for self-defense, there will *always* be substantial evidence to support an imperfect self-defense

14

instruction because the reasonableness of that belief will always be at issue.' " This logic has been applied where there is no dispute that the defendant and the victim were involved in a confrontation that ended with the use of deadly force, and thus the dispositive question was whether the defendant overreacted under the circumstances. (See, e.g., *People v. Ceja* (1994) 26 Cal.App.4th 78, 85–86 [cited in CALCRIM No. 505].) But it has never been adopted as a universal bright-line rule.[7] (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1273 ["To the extent *De Leon* and/or *Ceja* suggest that imperfect self-defense instructions must be given whenever perfect self-defense instructions are warranted by the evidence, we disagree"]; *People v. Simon* (2016) 1 Cal.5th 98, 132, 134 [affirming decision to deny request for imperfect self-defense instruction even though jury was instructed on perfect self-defense].)

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

DO, J.

---

7      Because we find no error in the court's decision not to read CALCRIM No. 571, we need not reach the parties' arguments concerning prejudice.